UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
THE INSURANCE COMPANY OF THE STATE : 
OF PENNSYLVANIA, :
  : 1:12-cv-06494-DLC
               Plaintiff, :
  :
  :
         vs. :
  :
  :
ARGONAUT INSURANCE COMPANY, :
  :
             Defendant. :
  :
  :
  :
  :
------------------------------------------------------------x


# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT


SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017-3954
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

*Attorneys for Plaintiff The Insurance
Company of the State of Pennsylvania*


Andrew S. Amer,
Rae C. Adams,
      *Counsel.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 5

    A.  Argonaut Agrees To Reinsure ICSOP For A Portion Of The Kaiser Risk..................... 5

    B.  ICSOP Reaches An Interim Coverage Settlement With Kaiser And Other
        Insurers ................................................................................................................. 6

    C.  ICSOP Provides Notice to Argonaut ............................................................................. 9

    D.  Argonaut Wrongfully Refuses to Honor Its Contractual Obligations to Provide
        Reinsurance Coverage to ICSOP under the Fac Cert ..................................................... 10

STANDARD OF REVIEW ................................................................................................. 11

ARGUMENT ...................................................................................................................... 12

I.    THE PARTIES' REINSURANCE CONTRACT IS GOVERNED BY CALIFORNIA
      LAW ....................................................................................................................... 12

    A.  There Is A Clear Conflict Between The Laws Of California And New York
        Regarding The Elements Of A Late Notice Defense Under A Reinsurance
        Contract ................................................................................................................... 12

    B.  Under New York's Choice-of-Law Rules, California Law Applies to the Parties'
        Reinsurance Contract ................................................................................................ 14

II.    ARGONAUT'S LATE NOTICE DEFENSES SHOULD BE DISMISSED BECAUSE
      ARGONAUT CANNOT SATISFY ITS HEAVY BURDEN OF ESTABLISHING
      ACTUAL AND SUBSTANTIAL PREJUDICE AS REQUIRED UNDER
      CALIFORNIA LAW ................................................................................................ 16

    A.  Argonaut Does Not, And Cannot, Assert That It Could Have Obtained A Better
        Contribution Agreement From The London Market Insurers ........................................ 18

    B.  Any Claimed Prejudice With Respect To Commutations Is Legally Irrelevant
        and, by Argonaut's Own Admission, "Pure Speculation" ............................................. 20

    C.  Argonaut's Argument Relating to Tax Benefits Is Legally Irrelevant and
        Contrary to the Undisputed Facts ............................................................................... 23

    D.   Argonaut's Vague Argument Relating to "Capital Allocation" Is Legally
Irrelevant and "Purely Speculation" ................................................................. 24

CONCLUSION ................................................................................................................. 25

## TABLE OF AUTHORITIES

**CASES**

*AIU Inc. Co. v. TIG Ins. Co.*, No. 07 Civ. 7052 (SJS), 2013 WL 1195258 (S.D.N.Y. March 25, 2013) ................................................................................................................13

*Arkwright-Boston Manufacturers Mut. Ins. Co. v. Calvert Fire Ins. Co.*, 887 F.2d 437 (2d Cir. 1989) ...............................................................................................................15, 16

*Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414 (2d Cir. 2001) .........................................12, 15, 16

*Campbell v. Allstate Ins. Co.*, 60 Cal. 2d 303 (1963) ...................................................................13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..............................................................................11

*Christiania Gen. Ins. Corp. of New York v. Great Am. Ins. Co.*, 979 F.2d 268 (2d Cir. 1992) .................................................................................................................................13

*Clemmer v. Hartford Ins. Co.*, 22 Cal. 3d 865 (1978) ...................................................................13

*Doe v. Life Ins. Co. of North Am.*, 737 F. Supp. 2d 1033 (N.D. Cal. 2010) .................................16

*Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278 (2d Cir. 1981) .................................................13

*Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14 (2d Cir. 1995) ............................11

*Granite State Ins. Co. v. Clearwater Ins. Co.*, No. 09 Civ. 10607 (RKE), 2012 WL 1520851 (S.D.N.Y. Apr. 30, 2012) ...............................................................................14

*Huurman v. Foster*, No. 07 Civ. 9326 (MHD), 2010 WL 2545865 (S.D.N.Y. June 21, 2010) ...........................................................................................................................11, 12

*Ins. Co. of the State of Pa. v. Associated Int'l Ins. Co.*, 922 F.2d 516 (9th Cir. 1990) ..........passim

*Int'l Bus. Mach. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137 (2d Cir. 2004) .............................12

*Kaiser Cement & Gypsum Corp. v. Insurance Co. of the State of Pa.*, 155 Cal. Rptr. 3d 283 (Cal. Ct. App. 2013) ...............................................................................5, 6, 7, 8

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...........................12

*Nat. Am. Ins. Co. of Cal. v. Certain Underwriters at Lloyd's London*, 93 F.3d 529 (9th Cir. 1996) ...........................................................................................................................13

*Nat. Union Fire Ins. Co. of Pittsburgh, Pa v. Am. Re-Ins. Co.*, 351 F. Supp. 2d 201 (S.D.N.Y. 2005) ........................................................................................................15

*Pac. Employers Ins. Co. v. Superior Court*, 221 Cal. App. 3d 1348 (1990) ................................13

*Pac. Mut. Life Ins. Co. v. Pac. Sur. Co.*, 69 Cal App. 730 (1924) .................................19

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002).......................................11

*Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135 (2d Cir. 2008) .............................................15, 16

*Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715 (Cal. Ct. App. 1993) ...17, 20, 25

*Steadfast Ins. Co. v. Dobbas*, No. CIVS05-0632FCD JFM, 2006 WL 89512 (E.D. Cal. Jan. 11, 2006) .........................................................................................17, 23, 25

*TIG Premier Ins. Co.v. Hartford Accident & Indem. Co.*, 35 F. Supp.2d 348 (S.D.N.Y. 1999) ................................................................................................................15, 16

*Travelers Cas. And Sur. Co. v. Dormitory Auth.*, No. 07 Civ. 6915 (DLC), 2008 WL 4861910 (S.D.N.Y. Nov. 5, 2008) .............................................................12, 14, 15

*Truck Ins. Exchange v. Kaiser Cement and Gypsum Corp.*, No. BC249550, 2006 WL 5838335 (Sup. Ct. Cal. Dec. 13, 2006) ......................................................................7

*Twin City Fire Ins. Co., Inc. v. Mitsubishi Motors Credit of Am., Inc.*, No. SA CV 04-43-GLT (MLGx), 2005 WL 5980994 (C.D. Cal. Feb. 22, 2005) ..................................17

*Unigard Sec. Ins. Co., Inc. v. North River Ins. Co.*, 4 F.3d 1049 (2d Cir. 1991) ....................12, 14

**STATUTES**

Fed. R. Civ. Proc. 56 ............................................................................................11

Plaintiff The Insurance Company of the State of Pennsylvania ("ICSOP"), by and through its undersigned attorneys, respectfully submits this Memorandum of Law, along with the Declarations of Andrew S. Amer, Esq. (the "Amer Decl.") and Patrick DiCaprio (the "DiCaprio Decl."), in support of Plaintiff's Motion for Partial Summary Judgment dismissing defenses asserted by Defendant Argonaut Insurance Company ("Argonaut") premised upon alleged late notice.

## PRELIMINARY STATEMENT

This action arises out of Argonaut's wrongful refusal to provide reinsurance coverage for millions of dollars in losses ICSOP has paid pursuant to a settlement agreement with its insured, Kaiser Cement and Gypsum Corporation ("Kaiser"), to fund a portion of Kaiser's asbestos liabilities. Argonaut's refusal is based, in large part, on a late notice defense, which it asserts in the First, Second and Third Affirmative Defenses of its answer to ICSOP's complaint. ICSOP is entitled to partial summary judgment dismissing these defenses because even assuming, *arguendo*, that notice was late, Argonaut has not suffered any "actual and substantial prejudice" required under California law to succeed on a late notice defense.

The relevant facts are not in dispute. Argonaut issued a reinsurance contract to ICSOP agreeing to assume 20% of ICSOP's risk under an excess umbrella liability policy ICSOP issued to Kaiser effective January 1, 1974 with a limit of $5 million excess of $500,000 in primary limits on a per occurrence basis. Over the course of a number of years, the court in Kaiser's California-based coverage action against ICSOP and Kaiser's other insurers issued a number of rulings that affected whether, and to what extent, ICSOP would be obligated to provide coverage to Kaiser for asbestos claims. Those rulings determined that: (i) each asbestos claim is a separate occurrence subject to a separate occurrence limit; (ii) neither the ICSOP

policy nor the underlying primary policy in the 1974 year has any applicable aggregate limit; and (iii) ICSOP is liable to Kaiser for that portion of any individual asbestos claim exceeding the $500,000 primary limit up to $5 million where the claimant was first exposed to asbestos in or before 1974. Following these rulings, Kaiser, ICSOP and certain other excess insurers agreed in July 2009 to an interim funding arrangement pending the final outcome of an appeal in the coverage litigation (which is ongoing).

Although Kaiser initiated coverage litigation against ICSOP in 2002, it was not until 2009, during the course of negotiating the funding arrangement, that Kaiser first identified and tendered to ICSOP specific asbestos claims involving amounts in excess of $500,000 for which Kaiser demanded payment from ICSOP in accordance with the court's rulings. Shortly after receiving and evaluating these specific claims, ICSOP sent a notice of loss to Argonaut under the reinsurance contract on June 3, 2009. Subsequent to sending this notice of loss to Argonaut, ICSOP answered numerous inquiries from Argonaut and provided Argonaut with periodic status reports and substantial documentation concerning the California coverage litigation, the ▮▮▮▮▮▮▮▮▮▮▮▮ and the underlying Kaiser asbestos claims. Nevertheless, Argonaut refused to pay its share of the Kaiser asbestos losses, relying primarily on a late notice defense, which prompted ICSOP to commence this breach of contract action.

The parties' reinsurance contract is governed by California law. Argonaut underwrote the reinsurance contract out of its then California home office in Menlo Park and issued the contract through a reinsurance broker located in San Francisco to ICSOP's underwriting manager in San Francisco, which acted with full agency authority to bind the risk on behalf of ICSOP in California. The reinsurance contract covers ICSOP's excess umbrella policy issued to Kaiser, an insured located in Oakland, California. In short, the reinsurance

contract was negotiated, issued and bound in California to cover a California risk, making the applicable law that of California.

Under California insurance law, a reinsurer cannot succeed on a late notice defense unless the reinsurer can establish that it suffered actual and substantial prejudice as a result of delay in notice. Argonaut argues that it has suffered prejudice in four respects, none of which meets the "actual and substantial prejudice" test under California law.

**First**, Argonaut contends that it has been prejudiced as a result of an agreement ICSOP reached with certain London market excess insurers whereby those insurers *agreed to participate with ICSOP in the* ███████████████ -- even though they were not obligated to do so under the court's rulings -- in exchange for ██████████████ ███████████ Argonaut has not articulated what deal it would have tried to reach with the London market excess insurers or whether any such deal would have been materially different from the deal that was reached, nor can it plausibly explain how an agreement that ██████ ICSOP's financial obligation through contribution from other insurers (and, in turn, ██████ Argonaut's reinsurance obligation) somehow gives rise to prejudice.

**Second**, Argonaut claims prejudice arising out of numerous agreements reached with its own reinsurers (called "retrocessionaires") prior to the date it received notice of loss from ICSOP whereby Argonaut released those entities from further liability for losses paid under its reinsurance contract with ICSOP in exchange for additional compensation. According to Argonaut, but for these agreements (known as "commutations"), Argonaut would be able to pass a portion of the Kaiser loss onto these retrocessionaires. Argonaut's claim of prejudice due to commutations with its retrocessionaires is based solely on conjecture and speculation. As an initial matter, all but two of the commutations were executed in or before 2003, years before the

key court rulings in the California coverage litigation suggested any reasonable likelihood that ICSOP's excess policy would be implicated, and years before ICSOP established any reserves on its books. There is no evidence suggesting that Argonaut would have accounted any differently for the risk presented by the Kaiser asbestos claims than it did in any commutation negotiation had it received a precautionary notice of loss from ICSOP before the court issued coverage rulings suggesting the ICSOP excess policy might be reached and before ICSOP reported any reserves. Moreover, the evidence cannot support a finding of real and substantial prejudice because, as Argonaut's Vice President in charge of assumed reinsurance business, Chris Hollender, conceded at his deposition, Argonaut already included in its commutation pricing formula an amount for unknown losses and he was unable to say whether Argonaut would have decided against executing any of the commutations or would have increased its commutation price had Argonaut received prior notice of the Kaiser claims.

      **Third**, Argonaut maintains that the timing of ICSOP's notice was prejudicial due to potential adverse tax consequences arising from purportedly late posting of reserves. However, Mr. Hollender was unable to articulate what reserves Argonaut would have posted had Argonaut received earlier notice, and conceded that he was therefore not in a position to calculate what, if any, adverse tax consequences Argonaut may have suffered. Argonaut's prejudice argument with respect to adverse tax consequences thus falls woefully short of meeting the stringent standard under California law.

      **Fourth**, Mr. Hollender testified in the vaguest of terms that the timing of ICSOP's notice "could" have a negative impact on Argonaut's plans for allocating capital for other uses. However, he candidly admitted that he was unable to calculate what the purported negative impact might be, no one else at Argonaut had done such calculation, and any prejudice

was therefore pure speculation.  Clearly, Argonaut has not suffered any "actual and substantial" prejudice based on the allocation of its capital.

*   *   *

Because there is no evidence upon which a reasonable jury could find that Argonaut suffered any prejudice arising from ICSOP's notice – much less "actual and substantial" prejudice as required by California law – ICSOP is entitled to partial summary judgment dismissing Argonaut's late notice affirmative defenses.

## STATEMENT OF FACTS

### A.    Argonaut Agrees To Reinsure ICSOP For A Portion Of The Kaiser Risk

Kaiser purchased policies of comprehensive general liability insurance from numerous insurers, including ICSOP, covering the period from 1964 to 1983.  *See Kaiser Cement & Gypsum Corp. v. Insurance Co. of the State of Pa.*, 155 Cal. Rptr. 3d 283, 286 (Cal. Ct. App. 2013) (*"Kaiser"*).  Of particular relevance here are the policies within Kaiser's coverage block incepting on January 1, 1974.  The primary policy effective on that date was issued by Truck Insurance Company ("Truck") and provided limits of $500,000 per occurrence and no aggregate limit (the "1974 Truck Policy").  *See id.*  ICSOP—through the California office of its underwriting manager CV Starr—issued an excess umbrella policy to Kaiser attaching immediately above the 1974 Truck Policy bearing policy no. 4174-5841 (the "Excess Policy"), also incepting on January 1, 1974.[1]  The Excess Policy provided coverage of $5,000,000 per occurrence excess of the 1974 Truck Policy with no general aggregate limit.  *See* Amer Decl., Ex. 2; DiCaprio Decl. ¶ 8.

Argonaut agreed to reinsure ICSOP for a portion of the losses paid to Kaiser

---

[1]    CV Starr, as ICSOP's underwriting manager, had authority to bind risks on ICSOP paper out of its California office without any further authorization from ICSOP personnel.  *See* Amer Decl., Ex. 1 at 158:17-159:2; DiCaprio Decl. ¶ 7.

under the Excess Policy pursuant to Facultative Certificate DX-0693-A (the "Fac Cert"), which was effective January 1, 1974 until cancelled by agreement of the parties effective May 1, 1975. *See* Amer. Decl., Ex. 3.  The Fac Cert was underwritten by Argonaut out of its then home office in Menlo Park, California and delivered through the California office of reinsurance broker Guy Carpenter to CV Starr's California office. *See* Amer Decl., Ex. 3; Ex. 1 at 158:3-12.  Pursuant to the Fac Cert, Argonaut agreed to provide reinsurance coverage in the amount of $1,000,000 part of $5,000,000 per occurrence, or a 20% share of the Excess Policy, in exchange for a proportionate share of the premium. *See* Amer Decl., Ex. 3.

The Fac Cert expressly provides that the "liability of [Argonaut] . . . shall follow that of [ICSOP]," and that "[u]pon receipt of a definitive statement of loss, [Argonaut] shall promptly pay its proportion of such loss." *See id*.  In addition, the Fac Cert contains the following notice provision:

> [ICSOP] shall notify [Argonaut] of any occurrence which in [ICSOP's] estimate of the value of the injuries or damages sought, without regard to liability, might result in judgment in an amount sufficient to involve this certificate of reinsurance.  [ICSOP] shall also notify [Argonaut] promptly of any occurrences in respect of which [ICSOP] has created a loss reserve equal to or greater than fifty (50) percent of [ICSOP's] retention specified in Item 3 of the Declarations; or, if this reinsurance applies on a contributing excess basis, when notice of claim is received by [ICSOP]. . . .

*Id.*

**B.      ICSOP Reaches An Interim Coverage Settlement With Kaiser And Other Insurers**

From 1944 through the 1970's, Kaiser manufactured a variety of asbestos products, including joint compounds, finishing compounds, fiberboard and plastic cements. *See Kaiser*, 155 Cal. Rptr. 3d at 286.  Beginning in the early 1980s, numerous plaintiffs began filing suits against Kaiser alleging bodily injury from asbestos exposure.  Kaiser tendered these claims

to its primary insurers, including Truck, for indemnification and defense. *See id.* By 2001,

Truck notified ICSOP and other excess carriers that its primary limits were exhausted, and

brought an action against Kaiser in California state court seeking a declaration that it owed no

further obligation to provide coverage for Kaiser's asbestos claims under its primary policies

(the "California Coverage Litigation"). *See id.* at 286-287; DiCaprio Decl. ¶ 9. In 2002, Kaiser

filed a cross-complaint against its excess insurers—including ICSOP and certain London market

insurers (the "London Market Insurers")—seeking a declaration that the excess insurers were

obligated to defend and indemnify Kaiser for the asbestos bodily injury claims once primary

coverage was exhausted. *See Kaiser,* 155 Cal. Rptr. 3d at 287; DiCaprio Decl. ¶ 10.

Over the next several years, the court in the California Coverage Litigation issued

a number of critical rulings affecting coverage under the 1974 Truck Policy and the Excess

Policy. In 2006, the trial court found that Truck and Kaiser had intended to treat all asbestos

bodily injury claims as a single occurrence under the policies. *See Truck Ins. Exchange v. Kaiser

Cement and Gypsum Corp.*, No. BC249550, 2006 WL 5838335 (Sup. Ct. Cal. Dec. 13, 2006);

DiCaprio Decl. ¶¶ 11-12. The excess insurers appealed, and, in 2007, the Court of Appeal,

Second District, reversed the trial court, finding that the plain language of the policies could not

support the conclusion that Kaiser's design, manufacture, and distribution of asbestos products

was an "occurrence," but, rather, the relevant "occurrence" was injurious exposure to asbestos

products. *See Kaiser*, 155 Cal. Rptr. 3d at 288; DiCaprio Decl. ¶ 13. Upon a subsequent motion

by Truck, in January 2008, the trial court found that for purposes of further proceedings in the

case, "the claim of each asbestos bodily injury claimant shall be deemed to have been caused by

a separate and distinct occurrence within the meaning of the Truck policies." *Kaiser*, 155 Cal.

Rptr. 3d at 289; DiCaprio Decl. ¶ 14.

Pursuant to California law allowing an insured to target a single year of primary coverage within the exposure period to pay "all sums" due to a continuous injury claim such as asbestos, Kaiser selected the 1974 year – a year in which the primary policy had no applicable aggregate limit. *See Kaiser*, 155 Cal. Rptr. 3d at 289; DiCaprio Decl. ¶ 15. Kaiser then moved for a declaration that, if an asbestos bodily injury claim alleged against Kaiser involves exposure during the 1974 Truck Policy period, and Kaiser selects that year to respond, then the Excess Policy—and, if necessary, any excess policies directly above it—become liable for that claim once Truck has paid and exhausted its $500,000 per-occurrence limit for that claim, and Kaiser has paid its deductible. *See Kaiser*, 155 Cal. Rptr. 3d at 289; DiCaprio Decl. ¶ 16. ICSOP opposed Kaiser's motion, arguing that, under principles of "horizontal exhaustion," an excess insurer is not required to indemnify an insured before the limits of all applicable primary policies in the exposure period are exhausted—not just the limits of the underlying primary policy in the selected year. *See Kaiser*, 155 Cal. Rptr. 3d at 290; DiCaprio Decl. ¶ 17. In its June 2008 coverage decision, the trial court agreed with Kaiser's argument that the "stacking" of primary policy limits was inappropriate and that Truck was liable for only one per occurrence limit on each claim. Accordingly, the trial court held that once Truck exhausted its $500,000 per occurrence limit under the 1974 Truck Policy, coverage under the Excess Policy would attach. *See Kaiser*, 155 Cal. Rptr. 3d at 290; DiCaprio Decl. ¶ 18.

Following the June 2008 ruling, Kaiser, ICSOP and the London Market Insurers entered into a mediation, resulting in a comprehensive settlement agreement executed on July 30, 2009 (the "Settlement") setting forth ███████████████████████████████████

██████████████████████████████ *See* DiCaprio Decl. ¶ 19.  Pursuant to the

Settlement, █████ and the ███████████████ agreed to indemnify █████ for a specified

percentage of past and future asbestos bodily injury claims to the extent that the amount paid by

Kaiser and/or Truck to resolve the claims exceeds the 1974 Truck Policy primary limit, subject

to █████████ depending on the outcome of the appeal.  *See id.* at ¶¶ 19, 21.  In February

2010, the trial court entered judgment for Kaiser and against ICSOP on Kaiser's cross-complaint

and ICSOP and the London Market Insurers thereafter appealed.  *See id.* at ¶ 22.

### C.   ICSOP Provides Notice to Argonaut

On June 3, 2009, ICSOP sent Argonaut a notice of loss under the Fac Cert.  *See*

Amer Decl., Ex. 4.  Thereafter, ICSOP, through the intermediary Guy Carpenter, sent Argonaut

status reports and updated loss advices to keep Argonaut apprised of developments in the

California Coverage Litigation and individual asbestos claims that required, or were reasonably

likely to require, reimbursement under the Settlement.  *See, e.g.,* Amer Decl., Exs. 5-11.  ICSOP

also provided Argonaut with itemized claims billings for all unsettled balances under the Fac

Cert.  *See* Amer Decl., Ex. 12.

In addition to receiving this information, in April 2010 Argonaut conducted an

on-site audit of ICSOP's claim files for numerous risks, including Kaiser.  *See* Amer Decl., Ex. 1

at 180:15-22.  As part of this audit, Argonaut requested and received numerous documents

related to the California Coverage Litigation, including the Settlement.  *See* Amer Decl., Ex. 13.

Included in these documents were emails and letters from ICSOP's attorneys providing detailed

legal analyses of the California Coverage Litigation.  *See id.*; Amer Decl. Ex. 1 at 185:19-186:3.

---

[2]   In connection with the mediation, Kaiser, for the first time, provided a list of specific
asbestos claims for which it had paid in excess of the $500,000 limit of the 1974 Truck
Policy.  *See* DiCaprio Decl. ¶ 20.

**D.    Argonaut Wrongfully Refuses to Honor Its Contractual Obligations to Provide Reinsurance Coverage to ICSOP under the Fac Cert**

Despite receiving detailed information about the Kaiser claims and the California Coverage Litigation between 2009 and 2013, Argonaut disputes its obligation to provide any reinsurance coverage under the Fac Cert with respect to sums paid by ICSOP pursuant to the Settlement. Argonaut asserts as the principal basis for its refusal to pay the timing of ICSOP's notice of loss, as reflected in Argonaut's First, Second and Third Affirmative Defenses. *See* Amer Decl., Ex. 14 at 7. During his deposition, Chris Hollender—the individual Argonaut designated as its corporate representative most knowledgeable regarding any "prejudice Defendant claims to have suffered as a result of Plaintiff's notice"—testified that Argonaut suffered prejudice in four ways as a result of the timing of ICSOP's notice:

1. *The London Market Insurers' Contribution Under The Settlement*: Mr. Hollender testified that the contribution by the London Market Insurers pursuant to the Settlement was prejudicial due to the lack of knowledge Argonaut has about the negotiations surrounding, and the reasons for, the amount agreed to as the London Market Insurers' share: "I'm sitting here today having really no clue as to how it is that ▮▮▮▮ and ▮ i agreed to share the loss that gets above the half a million dollar limit provided by the [1974] Truck policy. I think that's prejudicial to us. I think it's something that we were looking for either through audit and wasn't able to see that." Amer Decl., Ex. 1 at 171:7-13. When asked if Argonaut would have sought to reach a different deal with the London Market Insurers, Mr. Hollender answered: "I'm not sure." *Id.* at 173:23-24.

2. *Commutations With Retrocessionaires*: Prior to receiving notice from ICSOP in June 2009, Argonaut had entered into commutations with certain of the retrocessionaires who participated on a reinsurance contract to which Argonaut ceded a portion of the risk assumed under the Fac Cert.[3] Mr. Hollender testified that although "it would be pure speculation" as to whether earlier "precautionary notice would have affected the commutation negotiations" with Argonaut's retrocessionaires (*id.* at 224:13-225:2-4), "prejudice *could* arise either because Argonaut might have avoided commutation or . . . commuted for a different price" if it had received earlier notice from ICSOP. *Id.* at 207:11-16 (emphasis added).

---

[3]    A commutation is an agreement whereby the reinsurer and reinsured terminate the reinsurance contract in exchange for a negotiated payment by the reinsurer that is intended to reflect the present value of the expected losses. In effect, a commutation is an agreement by the reinsurer to buy back the policy of reinsurance. *See* Amer Decl., Ex. 15.

3. *Tax Benefits from Reserves*: Mr. Hollender testified that because "the timing of posting reserves impacts tax benefits that would accrue to [Argonaut] . . . that is an area of prejudice, but it's very difficult to kind of pinpoint what that would be." *Id.* at 254:22-255:16.

4. *Allocation of Capital*: Mr. Hollender testified that Argonaut had been prejudiced by the timing of ICSOP's notice because when the claims were made, if "[Argonaut] had nothing on [its] book, it could impact negatively [Argonaut's] plans for allocating capital for other uses. But I couldn't calculate that for you." *Id.* at 267:10-15.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56. Although the party moving for summary judgment bears the initial burden of informing the court of the basis for its motion, "[i]f the non-moving party has the burden of proof on a specific issue, the movant may satisfy [its] initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim." *Huurman v. Foster*, No. 07 Civ. 9326 (MHD), 2010 WL 2545865, *7 (S.D.N.Y. June 21, 2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 325 (1986); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995)).

Further, "[i]f the moving party carries [its] initial burden, the opposing party must then shoulder the burden of demonstrating a genuine issue of material fact." *Huurman*, 2010 WL 2545865 at *7 (citations omitted). In making this showing, "the opposing party cannot rest 'merely on allegations or denials' of the factual assertions of the movant, nor can [it] rely on [its] pleadings or on merely conclusory factual allegations." *Id.* (citations omitted). Rather, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986), by "present[ing] specific evidence in support of [its] contention that there is a genuine

dispute as to the material facts." *Huurman*, 2010 WL 2545865 at *7 (citations omitted).

**ARGUMENT**

**I.   THE PARTIES' REINSURANCE CONTRACT IS GOVERNED BY CALIFORNIA LAW**

> **A.   There Is A Clear Conflict Between The Laws Of California And New York Regarding The Elements Of A Late Notice Defense Under A Reinsurance Contract**

When exercising diversity jurisdiction, federal courts must look to the choice of

law rules of the forum state. *See Int'l Bus. Mach. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137,

143 (2d Cir. 2004). "Under New York's choice-of-law rules, 'the first step' is to determine

'whether there is an actual conflict between the laws invoked by the parties.'" *Travelers Cas.*

*And Sur. Co. v. Dormitory Auth.*, No. 07 Civ. 6915 (DLC), 2008 WL 4861910, *2 (S.D.N.Y.

Nov. 5, 2008) (Cote., J.) (*citing Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 419 (2d Cir.

2001)). Based on statements made by Argonaut's counsel at the October 19, 2012 pretrial

conference, and the assertion of an affirmative defense alleging inadequate "practices,

procedures and controls to ensure prompt notification" (*see* Amer Decl., Ex. 14 at 7), it appears

Argonaut relies upon New York law (as interpreted by the Second Circuit in *Unigard Sec. Ins.*

*Co., Inc. v. North River Ins. Co.*, 4 F.3d 1049 (2d Cir. 1991)), while ICSOP contends that

California law applies. There is a clear conflict between the laws of California and New York

regarding the elements of a late notice defense under a reinsurance contract.

Under California law, "it is settled that an insurer, in order to avoid liability on the

basis of a breach of the notice clause, must establish actual and substantial prejudice." *Ins. Co.*

*of the State of Pa. v. Associated Int'l Ins. Co.*, 922 F.2d 516, 523 (9th Cir. 1990) ("*Associated*")

(*citing Campbell v. Allstate Ins. Co.*, 60 Cal. 2d 303, 305-06 (1963), *Clemmer v. Hartford Ins.*

*Co.*, 22 Cal. 3d 865, 882 (1978), and *Pac. Employers Ins. Co. v. Superior Court*, 221 Cal. App. 3d 1348, 1357 (1990)).  While there is no California Supreme Court decision addressing whether this "notice-prejudice" rule applies in the reinsurance context, the Ninth Circuit has expressly held that it does.  *Associated*, 922 F.2d at 524 (holding California's "notice-prejudice rule [applies] to contracts of reinsurance.").  The Ninth Circuit's decision in *Associated* is binding on this court under the Second Circuit's opinion in *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278 (2d Cir. 1981), which holds that when a circuit court sitting in diversity "has essayed its own prediction of the course of state law on a question of first impression" in a state in its jurisdiction, "the federal courts of other circuits should defer to that holding, perhaps always . . . ."  *Id.* at 283; *see also AIU Inc. Co. v. TIG Ins. Co.*, No. 07 Civ. 7052 (SJS), 2013 WL 1195258 (S.D.N.Y. March 25, 2013) (holding *Factors* bound court to apply Seventh Circuit case interpreting Illinois law on late notice in reinsurance context).  Accordingly, under California law, avoiding liability for a late notice defense under a reinsurance contract requires the reinsurer to prove "actual and substantial prejudice."  *Associated*, 922 F.2d at 524; *see also Nat. Am. Ins. Co. of Cal. v. Certain Underwriters at Lloyd's London*, 93 F.3d 529, 538 (9th Cir. 1996) ("Under California law, a reinsurer may invoke the defense of late notice so long as it immediately objects to the late notice, and suffers 'actual and substantial prejudice.'") (citations omitted).

In contrast, New York law as applied by the Second Circuit allows a reinsurer to prevail on a late notice defense in the absence of prejudice under limited circumstances.  In *Christiania Gen. Ins. Corp. of New York v. Great Am. Ins. Co.*, 979 F.2d 268, 281 (2d Cir. 1992), the Second Circuit held as a matter of first impression that a reinsured's failure to provide timely notice "may entitle the reinsurer to relief without showing prejudice if the reinsured acted in bad faith."  In *Unigard Sec. Ins. Co., Inc. v. North River Ins. Co.*, 4 F.3d 1049 (2d Cir. 1993), the

Second Circuit further elaborated on this exception, holding that bad faith in the context of reinsurance notice means either acting with an intent to deliberately deceive the reinsurer by withholding notice or acting with "gross negligence" by failing to implement "routine practices and controls to ensure notification to reinsurers" is timely.  4 F.3d at 1069; *see also Granite State Ins. Co. v. Clearwater Ins. Co.*, No. 09 Civ. 10607 (RKE), 2012 WL 1520851, *1 (S.D.N.Y. Apr. 30, 2012) (stating that "a reinsurer need not show prejudice to raise a successful lack of notice defense under New York law if it demonstrates that the cedent acted in 'bad faith'").

There is no California decision, state or federal, recognizing a "bad faith" exception to California's notice-prejudice rule requiring a showing of actual and substantial prejudice.  Accordingly, there is a clear conflict between the laws of California and New York with respect to late notice under a reinsurance contract requiring this Court to apply New York's choice-of-law rules governing disputes involving insurance contracts.  *See generally Travelers*, 2008 WL 4861910, *2 (Cote, J.) (holding that there was "a conflict between the laws of the two jurisdictions regarding delay in giving notice of a claim" where one jurisdiction required a showing of prejudice and the other did not).

### B.   Under New York's Choice-of-Law Rules, California Law Applies to the Parties' Reinsurance Contract

For choice-of-law conflicts regarding reinsurance contract claims, New York courts apply the "grouping of contacts" test:

> New York applies a grouping of contacts theory . . . looking to a spectrum of significant contacts—rather than a single possibly fortuitous event. . . . Along with the traditionally determinative choice of law factor of the place of contracting, the New York Court of Appeals has endorsed the following factors (identified in the Restatement): the places of negotiation and performance; the location of the subject matter; and the domicile or place of business of the contracting parties.

*Travelers*, 2008 WL 4861910, *3 (Cote., J.) (*citing Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d

135, 151-52 (2d Cir. 2008)).  Here, all factors under the "grouping of contacts" test point to California law.

The Fac Cert was underwritten by Argonaut out of its home office, then located in Menlo Park, California.  Amer Decl., Ex. 3 and Ex. 1 at 156:24-157:4.  The contract was brokered through the California office of reinsurance intermediary Guy Carpenter and issued to ICSOP through its underwriting manager CV Starr located in California.  *Id.,* Ex. 3 and Ex. 1 at 157:5-158:12.  The Fac Cert was therefore negotiated, underwritten, brokered and delivered in California, all weighing in favor of applying California law.  *See Arkwright-Boston Mfrs. Mut. Ins. Co. v. Calvert Fire Ins. Co.*, 887 F.2d 437, 439 (2d Cir. 1989) (finding North Carolina law applied where "the reinsurance certificate was issued there"); *Nat. Union Fire Ins. Co. of Pittsburgh, Pa v. Am. Re-Ins. Co.*, 351 F. Supp. 2d 201, 207 (S.D.N.Y. 2005) (finding Ohio law applied where "the reinsurance policy was issued in Ohio and negotiated between Ohio brokers"); *Booking*, 254 F.3d at 422 (finding Texas law applied where "the 'place of contracting' was Texas" and "the policy was negotiated in Texas"); *TIG Premier Ins. Co.v. Hartford Accident & Indem. Co.*, 35 F. Supp.2d 348, 350 (S.D.N.Y. 1999) (finding "the contract is governed by the . . . law of California, the state where, *inter alia*, the Reinsurance Contract was issued").

Furthermore, the parties anticipated that performance under the Fac Cert would occur in California; at the time of binding, losses ceded under the Fac Cert were intended by the parties to be submitted to Argonaut's Menlo Park office by CV Starr's California office through Guy Carpenter's California office for payment in California.  Amer Decl., Ex. 1 at 156:24-158:12 and Ex. 3.  The parties also understood that the underlying risk, Kaiser, was located in California, that claims giving rise to losses under the Fac Cert would arise in California, and that (as was the case) ICSOP's obligations under the Excess Policy would be governed by California

law. Amer Decl., Ex. 1 at 158:14-16 and Ex. 2. Finally, the Settlement pursuant to which

ICSOP has paid claims and now seeks reimbursement is governed by California law. *See*

DiCaprio Decl. ¶ 23. These undisputed facts weigh exclusively in favor of applying California

law to the Fac Cert. *See Arkwright-Boston*, 887 F.2d at 439 (finding that North Carolina law

applied where "any obligation to perform on the reinsurance contract would seem to arise in

North Carolina upon presentation of a claim"); *Schwartz*, 539 F.3d at 152 (finding that New

York law applied where the underlying actions were "filed, tried and ultimately settled in New

York"); *TIG*, 35 F. Supp. 2d at 350 (finding that California applied "where claims on [the]

certificate would be expected to be made" in California).

By contrast, New York has no relationship or contacts with the dispute or the Fac

Cert, and "[t]here is no evidence in the record tending to suggest that the contracting parties ever

contemplated performance of [the policy] in New York, or otherwise reasonably foresaw that

New York law could apply here." *Booking*, 254 F.3d at 423. Accordingly, the Court should

apply California law.

## II.  ARGONAUT'S LATE NOTICE DEFENSES SHOULD BE DISMISSED BECAUSE ARGONAUT CANNOT SATISFY ITS HEAVY BURDEN OF ESTABLISHING ACTUAL AND SUBSTANTIAL PREJUDICE AS REQUIRED UNDER CALIFORNIA LAW

Under California law, in order for a reinsurer "to avoid liability on the basis of a

breach of the notice clause, [the reinsurer] must establish actual and substantial prejudice."

*Associated*, 922 F.2d at 523. Further, "California case law 'place[s] a heavy burden on an

insurer seeking to defend on the ground of breach of the notice clause.'" *Id.* at 524 (citations

omitted); *see also Doe v. Life Ins. Co. of North Am.*, 737 F. Supp. 2d 1033, 1043 (N.D. Cal.

2010) ("Prejudice is hard to show under the rule."). In order to satisfy this "heavy burden," a

reinsurer "must demonstrate that it was prejudiced in the handling of an underlying claim in one

of two ways: (1) it would have settled the claim for less, or (2) it would have taken steps to reduce or eliminate Defendant's liability." *Twin City Fire Ins. Co., Inc. v. Mitsubishi Motors Credit of Am., Inc.*, No. SA CV 04-43-GLT (MLGx), 2005 WL 5980994, at *1 (C.D. Cal. Feb. 22, 2005). Accordingly, "[t]he insurer must show actual prejudice, not the mere possibility of prejudice. . . . prejudice does not arise merely because a delayed or late notice has denied the insurance company the ability to contemporaneously investigate the claim or interview witnesses . . . [or] the opportunity to make an early settlement of the claim." *Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715, 761 (Cal. Ct. App. 1993) (citations omitted). Argonaut does not come close to satisfying this heavy burden.

    Argonaut admits that it has not sought to exercise its contractual right under the Fac Cert to associate with ICSOP (at Argonaut's own expense) in the defense of the Kaiser claim; this is not surprising as Argonaut's Mr. Hollender could not recall any other instance in which Argonaut exercised this right under any of its facultative certificates. Amer Decl., Ex. 1 at 142:22-143:3; 143:15-144:2. Moreover, Argonaut cannot credibly claim that it was prejudiced because it would have associated in the defense of the California Coverage Litigation had it received notice from ICSOP sooner. As Mr. Hollender conceded at his deposition, Argonaut agrees with ICSOP's coverage position in the California Coverage Litigation and would not have suggested any different strategy.[4]   Amer Decl., Ex. 1 at 164:14-165:10 ("I think basically that the position that [ICSOP has] taken is correct and so I'm not sure that ultimately something different

---

[4]     In any event, even if Argonaut argues that it would have associated in the defense and suggested ICSOP take a different position in the California Coverage Litigation had it received notice sooner, such speculative arguments are insufficient as a matter of law. See *Steadfast Ins. Co. v. Dobbas*, No. CIVS05-0632FCD JFM, 2006 WL 89512, at *3 (E.D. Cal. Jan. 11, 2006) (holding that "while plaintiffs present evidence of what they would have done if they had notice of the claim, plaintiffs do *not* present evidence that, if these steps had been taken, it was substantially likely that the arbitrator would have found for the insured . . . [or] settled for considerably less").

would have been suggested by Argonaut."); 166:10-16.

Rather, Mr. Hollender – the witness designated by Argonaut as the most knowledgeable about its claims of prejudice –identified at his deposition the following four ways in which Argonaut has purportedly been prejudiced: (i) inability to participate in the negotiations with the London Market Insurers over their contribution to the funding arrangement in the Settlement; (ii) inability to consider the potential liability for Kaiser asbestos claims when negotiating commutations with its retrocessionaires; (iii) loss of tax benefits associated with the timing of reserves; and (iv) impact on Argonaut's allocation of capital.  As discussed below, these assertions are speculative at best, and for the most part are legally irrelevant.  Thus, Argonaut falls far short of establishing "actual and substantial" prejudice as a matter of law.

### A.    Argonaut Does Not, And Cannot, Assert That It Could Have Obtained A Better Contribution Agreement From The London Market Insurers

Argonaut's assertion of prejudice arising from the London Market Insurers' contribution arrangement in the Settlement is insufficient as a matter of law for two reasons.

**First**, Argonaut admits that obtaining contribution from the London Market Insurers relieved some of the financial burden on ICSOP, which in turn (of course) relieved some of the financial burden on Argonaut under the Fac Cert.  As Mr. Hollender acknowledged, based on the court's rulings in the California Coverage Litigation, absent the contribution agreement with London Market Insurers, ICSOP would have had to shoulder the entire burden for any claim in excess of the $500,000 limit of the 1974 Truck Policy (up to the limit of the Excess Policy).  Amer Decl., Ex. 1 at 174:13-20.  It defies logic to consider an arrangement that bestows a financial benefit on ISCOP, and hence on Argonaut, as giving rise to any prejudice at all, much less actual and substantial prejudice.

**Second**, Argonaut fails to articulate what different contribution agreement it

would have sought to negotiate with London Market Insurers had it been given notice sooner.
As Mr. Hollender conceded at his deposition, even after reviewing all of the information
provided by ICSOP on the California Coverage Litigation and settlement negotiations, he was
"not sure" about whether Argonaut would have urged ICSOP to negotiate a different
arrangement with London Market Insurers or what that different arrangement would be:

> Q:     Does Argonaut have a position as to what it would have done differently if
>        it had been given an opportunity to participate in those [settlement]
>        negotiations [among ICSOP, London and Kaiser]?
>
> A:     It's so hard to answer that question without having actually been given
>        that opportunity.  So . . .
>
> Q:     But Argonaut is claiming it was prejudiced.  I'm just trying to find out if
>        there's a specific prejudice in terms of something Argonaut would have
>        tried to do differently if it had been given the opportunity.
>
> A:     With the settlement itself, I'm not sure.  That's more difficult to say
>        whether we would have looked for something different in terms of the way
>        the settlement was drafted.  It's just not understanding the rationale and
>        the reasoning behind the split [between ICSOP and London].  So . . .

Amer Decl., Ex. 1 at 173:10-174:4.  As stated by Mr. Hollender, Argonaut was prejudiced not
because it would or could have attempted a more favorable arrangement with London Market
Insurers, but because of "[n]ot being advised of what was going on and not being able to
comment on the settlement and at least having a say in terms of how [it] would be allocated."  *Id.*
at 172:18-22.  Putting aside the speculative nature of Argonaut's argument, its assertion of
prejudice falls under the weight of the "follow the settlements" provision in the Fac Cert, (Amer
Decl., Ex. 3 at ARG0000373), which requires Argonaut to follow ICSOP's reasonable and good
faith settlements.  *See, e.g., Pac. Mut. Life Ins. Co. v. Pac. Sur. Co.,* 69 Cal App. 730 (1924).
Because Argonaut was contractually obligated to follow ICSOP's settlement, Argonaut cannot
claim any prejudice even if it believes a different arrangement should have been reached.

      In any event, this argument is legally insufficient under well settled California

law, which holds that a court may not "presume[] prejudice" merely because a party was

"deprived of the opportunity to 'join' and 'control' the underlying claim." *Associated*, 922 F.2d

at 525; *see also Shell*, 12 Cal. App. 4th at 761 ([P]rejudice does not arise merely because a

delayed or late notice has denied the insurance company . . . the opportunity to make an early

settlement of the claim."). Rather, a party must show that it would have negotiated a better

outcome. *See Associated*, 922 F.2d at 524.

### B.   Any Claimed Prejudice With Respect To Commutations Is Legally Irrelevant and, by Argonaut's Own Admission, "Pure Speculation"

Argonaut alleges prejudice because, prior to receiving notice from ICSOP in June

2009, it entered into 16 commutation agreements with its own reinsurers (or "retrocessionaires")

who, but for those commutations, would otherwise be liable to Argonaut for a portion of the

Kaiser losses under a reinsurance contract Argonaut purchased known as "Treaty X." Amer

Decl., Ex. 1 at 207:11-209:10. Argonaut's claim of prejudice arising from its decision to enter

into commutations with numerous retrocessionaires, nearly all of which were executed in or

before 2003,[5] is without merit for a number of reasons.

**First**, there is no case law supporting Argonaut's position that a reinsurer's

business decision to enter into a commutation with a retrocessionaire can ever give rise to the

type of actual and substantial prejudice required under California law to support a late notice

defense. To the contrary, as articulated by the Ninth Circuit:

> [T]he only prejudice sufficient to allow an insurer to avoid liability
> based on late notice is found in those cases where the insurer
> actually demonstrated that there was a substantial likelihood that it
> could have either defeated the underlying claim against its insured,
> or settled the case for a smaller sum than that for which its insured
> ultimately settled the claim.

*Associated*, 922 F.2d at 524. The decision in *Associated* is instructive on this point. In

---

[5]      *See* Amer Decl., Ex. 1 at 220:9-16; 233:6-16; 234:19-235:10; 242:23-248:5; 250:18-22.

*Associated*, the reinsurer (like Argonaut here) claimed prejudice due to its inability to assert a claim against a retrocessionaire, which had become insolvent between the time it claimed notice should have been given and when notice was actually given. *Id.* at 525. The Ninth Circuit rejected this argument, noting that the reinsurer "has cited no case, and we have found none, to support the proposition that such collateral matters may constitute prejudice so as to relieve an insurer from its liability under an insurance contract." *Id.* Similarly, a reinsurer's independent business decision to commute a reinsurance contract with one of its retrocessionaires is a "collateral matter" irrelevant to the prejudice analysis in California. *Id.*

**Second**, even if a reinsurer could rely on commutations with retrocessionaires to establish the requisite prejudice on a late notice defense under California law (which is not the case), Argonaut's argument ignores the fact that it received additional compensation from each retrocessionaire as part of each commutation. That Argonaut entered into commutations with its retrocessionaires proves nothing about any purported "prejudice," even if it were legally relevant under California law, unless Argonaut can establish it suffered "losses . . . result[ing] from the delayed notice." *Id.* In other words, Argonaut must show that it is now in a less favorable financial position having accepted the additional compensation for the commutations than it would otherwise be in if the retrocessionaires were still obligated to pay under Treaty X, and if so, that had it received notice from ICSOP sooner it would have either decided against entering into the commutations or negotiated more favorable prices for the commutations. As is evident from Mr. Hollender's deposition testimony, Argonaut cannot establish any of these facts.

As an initial matter, there is no basis to conclude that Argonaut is worse off for having entered into the commutations. As Mr. Hollender testified, the factors that Argonaut takes into consideration in determining what price to charge for a commutation are the paid

balances due from the retrocessionaire, the case reserves and the "IBNR [incurred but not reported] value on the business" (Amer Decl., Ex. 1 at 206:6-207:2), which reflects potential exposure for unknown claims.[6]  With respect to case reserves, Mr. Hollender conceded that it was unlikely Argonaut would have posted any case reserves prior to when ICSOP posted reserves even if it had received notice earlier. *Id.* at 227:11-25 ("[A]s long as ICSOP had not posted a reserve, it's probably unlikely that we would have posted a reserve.").  And during the time that Argonaut was negotiating the commutations, Argonaut included IBNR in its pricing to cover the contingency of unknown claims such as the Kaiser asbestos losses. *Id.* at 217:16-218:2.  Indeed, Mr. Hollender acknowledged that at the time the commutations were negotiated, Argonaut had a bulk IBNR reserve on its books for asbestos covering all unknown exposures (including Kaiser), and that for some of the commutations the IBNR factor was as much as ███ ███ times the case reserves. *Id.* at 216:23-217:4; 218:25-219:9.  Argonaut has presented no evidence to suggest that the IBNR component of the compensation it collected for the commutations, plus the investment income it earned on those amounts over several years, is less than the amount Argonaut would have been able to collect from these retrocessionaires for Kaiser's asbestos liability under Treaty X but for the commutations.  Accordingly, there is no support for the conclusion that Argonaut sustained any "loss" from entering into commutations as a result of delayed notice. *Associated*, 922 F.2d at 525 ("[T]here is no factual basis for concluding that [the reinsurer] suffered the alleged collateral losses, or that, had they been sustained, they would have resulted from the delayed notice.").

Nor is there any evidence suggesting that had Argonaut received notice earlier it

---

[6]     IBNR, which stands for "incurred but not reported," is a term commonly used in insurance, and reflects the total amount owed by the insurer to all valid claimants who have had a covered loss but have not yet reported it. *See* Amer Decl., Ex. 15.

would have either decided not to commute with its retrocessionaires or obtained a better price. When asked at his deposition whether there was a commutation Argonaut contends it would not have entered into with earlier notice, Mr. Hollender replied: "It's hard to say." Amer Decl., Ex. 1 at 209:23-210:6. And when asked if earlier notice would have affected Argonaut's negotiations over a commutation entered into in 2001, Mr. Hollender conceded "it would be pure speculation;" and speaking more generally about delayed notice, he could not say how developments in the California Coverage Litigation "would have swayed any particular deal" with retrocessionaires. *Id.* at 225:19-226:19. Thus, even if Argonaut's commutation argument was relevant to the prejudice analysis and Argonaut could prove a collateral loss resulting from the commutations, Argonaut's argument would still fail because Argonaut's contention that such loss was caused by delayed notice is pure speculation. *Steadfast*, 2006 WL 89512, at *4 ("the court [cannot] infer actual prejudice from the speculation of plaintiffs.").

### C.  Argonaut's Argument Relating to Tax Benefits Is Legally Irrelevant and Contrary to the Undisputed Facts

Argonaut maintains that if ICSOP had provided notice sooner, Argonaut may have posted reserves earlier and realized the tax benefit accruing from those reserves sooner. Amer Decl., Ex. 1 at 254:15-255:16. Argonaut's argument is insufficient as a matter of law. Under California law, the "inability to establish a reserve earlier and thereby obtain a tax deduction" does not constitute prejudice so as to relieve a reinsurer from its liability under a contract. *Associated*, 922 F.2d at 525.

Moreover, even if a deferred tax benefit could constitute actual and substantial prejudice (contrary to the holding in *Associated*), Argonaut's position fails based on the testimony of Mr. Hollender. First, by his own admission, "as long as ICSOP had not posted a reserve, it's probably unlikely that [Argonaut] would have posted a reserve." Amer Decl., Ex. 1

at 227:11-17, 227:22-228:9. Therefore, there is no evidentiary basis to conclude that earlier

notice from ICSOP, before ICSOP had posted reserves, would have caused Argonaut to post

reserves sooner. Second, even if earlier notice would have potentially impacted the timing of

Argonaut's reserves, Mr. Hollender admits, with respect to any loss of a tax benefit, that "it's

very difficult to kind of pinpoint what that would be," *id.* at 254:22-255:16, and nobody at

Argonaut has made any kind of a determination as to the reserves that should have been posted

and when they should have been posted.[7] *Id.* at 260:22-261:18. In short, even if potential tax

benefits were relevant to prejudice—they are not—and even if Argonaut could show it would

have posted reserves in the absence of ICSOP posting reserves—it cannot—Argonaut's

argument would still fail because it is based on pure speculation incapable of constituting actual

prejudice. *See Steadfast*, 2006 WL 89512, at *4.

> **D.  Argonaut's Vague Argument Relating to "Capital Allocation" Is Legally Irrelevant and "Purely Speculation"**

Argonaut's final category of alleged prejudice, that it's capital allocation plans

may have been negatively impacted by the timing of ICSOP's notice, is the vaguest of all of

Argonaut's positions. Argonaut's Mr. Hollender put the argument as follows:

> [I]t goes to capital allocation issues, something that I honestly
> don't get involved in. I've had discussions with in the past with
> one of our actuaries who tried to explain to me the amount of
> capital to support reserves for run-off areas is usually some
> amount. And so it's greater than a 1 to 1 ratio for example. So
> being slammed with claims and reserves that you had no – you had
> nothing on your book, it could impact negatively your plans for
> allocating capital for other uses. *But I couldn't calculate that for
> you. That's kind of beyond my skill set, to be honest.*

Amer Decl., Ex. 1 at 266:19-267:15 (emphasis added). Argonaut's designated 30(b)(6) witness

---

[7]     Indeed, Mr. Hollender acknowledged that the issue is merely one of timing—when, not
whether, Argonaut realized the tax benefit—and would be negligible based on low
interest rates in the current economic climate. *See* Amer Decl., Ex. 1 at 260:22-261:18.

on prejudice testified that nobody at Argonaut has attempted to quantify any alleged damages on this point, and that such a calculation would be "purely speculation." *Id.* at 267:25-268:5.

As with Argonaut's other prejudice arguments concerning commutations and reserves, this argument involves a "collateral loss" that is legally irrelevant to the issue of prejudice and, in any event, entirely too speculative to satisfy the "heavy burden" required under California law. *See Associated*, 922 F.2d at 525; *Steadfast*, 2006 WL 89512, at *4; *Shell*, 12 Cal. App. 4th at 761.

## **CONCLUSION**

For the reasons set forth above, the Court should grant ICSOP's motion for partial summary judgment, enter an order dismissing Argonaut's First, Second and Third Affirmative Defenses premised upon late notice, and grant such other and further relief deemed necessary and appropriate by the Court.

Dated:  May 17, 2013
　　　　New York, New York

SIMPSON THACHER & BARTLETT LLP

By: _____
　　　Andrew S. Amer
　　　Rae C. Adams

425 Lexington Avenue
New York, N.Y. 10017-3954
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

*Attorneys for Plaintiff The Insurance Company of the State of Pennsylvania*