UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
THE INSURANCE COMPANY OF THE STATE   :
OF PENNSYLVANIA,                     :
                                     :
                    Plaintiff,       :
                                     :     12 Civ. 6494 (DLC)
        vs.                          :
                                     :
ARGONAUT INSURANCE COMPANY,          :
                                     :
                    Defendant.       :
                                     :
------------------------------------------------------------x

## DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS PURSUANT TO RULE 56.1

Argonaut Insurance Company ("Defendant") hereby submits its Response under Local Civil Rule 56.1 to the Statement of Material Facts provided by The Insurance Company of the State of Pennsylvania ("ICSOP" or "Plaintiff").   The facts herein are supported by the Declaration of Sean Thomas Keely, dated May 17, 2013, and the exhibits annexed thereto, Declaration of Sean Thomas Keely in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment, dated June 7, 2013, and the exhibits attached thereto, along with the pleadings filed in this action. Citations to "Keely Decl. Ex. ___" refer to the exhibits annexed to the Declaration made in support of Defendant's motion of summary judgment.   Citations to "Keely Opp. Decl. Ex. __" refer to the exhibits annexed to the Declaration of Sean Thomas Keely in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment, dated June 7, 2013.

### Responses to the Facts Set Forth in ICSOP's Statement of Material Facts

<u>THE PARTIES</u>

        *1.     Plaintiff ICSOP is a Pennsylvania insurance company that maintains its principal place of business at 175 Water Street, 18th Floor, New York, New York, 10038. ICSOP is an affiliate of the American International Group. See Declaration of Patrick DiCaprio, dated May 16, 2013 ("DiCaprio Decl.") ¶ 3.*

        <u>Response</u>: Not disputed.

        *2.     Defendant Argonaut is an Illinois insurance company that maintains its principal place of business at 10101 Reunion Place, Suite 500, San Antonio, Texas, 78216. See DiCaprio Decl. ¶ 4.*

        <u>Response</u>: Disputed.  While Argonaut is an insurance company incorporated in Illinois, its principal place of business is 175 E. Houston Street, Suite 1300, San Antonio, Texas 78205.  *See* Answer and Affirmative Defenses to Complaint, filed August 27, 2012 ("Answer") ¶ 5.

<u>THE EXCESS POLICY</u>

        *3.     Truck Insurance Exchange ("Truck") provided comprehensive general liability insurance to Kaiser Cement and Gypsum Corporation ("Kaiser") through a primary insurance policy incepting on January 1, 1974, and with limits of $500,000 per occurrence and no aggregate limit (the "1974 Truck Policy"). Kaiser Cement & Gypsum Corp. v. Insurance Co. of the State of Pa., 155 Cal. Rptr. 3d 283, 286 (Cal. Ct. App. 2013).*

        <u>Response</u>: Not disputed.

        *4.     ICSOP, through the California office of its underwriting manager CV*

*Starr, issued an excess umbrella policy to Kaiser attaching immediately above the 1974 Truck*
*Policy under policy no. 4174-5841 (the "Excess Policy"), incepting on January 1, 1974. See*
*Declaration of Andrew S. Amer, Esq., dated May 16, 2013 ("Amer Decl.") Ex. 2; DiCaprio*
*Decl. ¶ 6.*

Response: Not disputed.

5.      *The Excess Policy provided coverage of $5,000,000 per occurrence excess*
*of the 1974 Truck Policy with no general aggregate limit. See Amer Decl., Ex. 2; DiCaprio Decl.*
*¶ 8.*

Response: Not disputed.

6.      *CV Starr, as ICSOP's underwriting manager, had authority to bind risks on*
*ICSOP paper out of its California office without any further authorization from ICSOP*
*personnel. Consistent with this authority, CV Starr issued the Excess Policy to Kaiser without*
*review or further authorization from ICSOP personnel. See Amer Decl., Ex. 1 at 157:5-12,*
*158:17-159:2; DiCaprio Decl. ¶ 7.*

Response: Disputed.  Argonaut does not dispute that CV Starr acted as underwriting
manager for ICSOP and issued the Excess Policy to Kaiser out of its California office.
Argonaut does not have information in order to admit whether CV Starr issued the policy
"without review or further authorization from ICSOP personnel."  Mr. DiCaprio could not
recall at his deposition the details of CV Starr's role with respect to the Kaiser policy.  (Keely
Opp. Decl. Ex. D at 194-195.)  Nor did Mr. Hollender, who did not work either for CV Starr or
ICSOP, have knowledge of the specific attributes of CV Starr's binding authority but testified
only that he understood CV Starr to have authority to write special lines of business out of its

California office.  (Amer Decl., Ex. 1 at 158:17-159:2.)

**THE REINSURANCE CONTRACT**

7.     *Argonaut agreed to reinsure ICSOP for a portion of the losses paid to Kaiser under the Excess Policy pursuant to Facultative Certificate DX-0693-A (the "Fac Cert"), which was effective January 1, 1974 until cancelled by agreement of the parties effective May 1, 1975. See Amer Decl., Ex. 3.*

Response: Not disputed.

8.     *The Fac Cert was underwritten by Argonaut out of its then home office in Menlo Park, California and delivered through the California office of reinsurance broker Guy Carpenter to C.V. Starr's California office. See Amer Decl., Ex. 1 at 157:5-159:2.*

Response: Not disputed.

9.     *Consistent with its authority as underwriting manager for ICSOP, CV Starr negotiated and accepted the Fac Cert without review or further approval from ICSOP personnel. See id.*

Response: Disputed.  Argonaut does not dispute that CV Starr acted as underwriting manager for ICSOP and negotiated and accepted the Fac Cert.  Argonaut does not have information in order to admit whether CV Starr did so "without review or further authorization from ICSOP personnel."  Mr. DiCaprio could not recall at his deposition the details of CV Starr's role with respect to the Kaiser policy. (Keely Opp. Decl. Ex. D at 194-195.)  Nor did Mr. Hollender, who did not work either for CV Starr or ICSOP, have knowledge of the specific attributes of CV Starr's binding authority but testified only that he

4

understood CV Starr to have authority to write special lines of business out of its California office. (Amer Decl., Ex. 1 at 158:17-159:2.)

       *10.    Pursuant to the Fac Cert, Argonaut agreed to provide reinsurance coverage in the amount of $1,000,000 part of $5,000,000 per occurrence, or a 20% share of the Excess Policy, in exchange for a proportionate share of the premium. See Amer Decl., Ex. 3.*

    Response: Not disputed.

       *11.    The Fac Cert expressly provides that the "liability of [Argonaut] . . . shall follow that of [ICSOP]," and that "[u]pon receipt of a definitive statement of loss, [Argonaut] shall promptly pay its proportion of such loss." See Amer Decl., Ex. 3.*

    Response: Not disputed.

       *12.    The Fac Cert further provided that ICSOP "shall notify [Argonaut] of any occurrence which in [ICSOP's] estimate of the value of the injuries or damages sought, without regard to liability, might result in judgment in an amount sufficient to involve this certificate of reinsurance. [ICSOP] shall also notify [Argonaut] promptly of any occurrences in respect of which [ICSOP] has created a loss reserve equal to or greater than fifty (50) percent of [ICSOP's] retention specified specified in Item 3 of the Declarations; or, if this reinsurance applies on a contributing excess basis, when notice of claim is received by [ICSOP]. . . ." Id.*

    Response: Disputed.  The Fact Cert properly reads: ICSOP "shall notify [Argonaut] **promptly** of any occurrence which in [ICSOP's] estimate of the value of the injuries or damages sought, without regard to liability, might result in judgment in an amount sufficient to involve this certificate of reinsurance. [ICSOP] shall also notify [Argonaut] promptly of any

occurrences in respect of which [ICSOP] has created a loss reserve equal to or greater than fifty (50) percent of [ICSOP's] retention specified in Item 3 of the Declarations; or, if this reinsurance applies on a contributing excess basis, when notice of claim is received by [ICSOP]… ." (Ex. 5 (Condition C) at ARG00000373.) (emphasis in bold added to word not included in ICSOP's quotation from the Fac Cert).

Additionally, the Facultative Certificate applied on a contributing excess basis. (Keely Decl. Ex. 5 at ARG00000372.)

## THE CALIFORNIA COVERAGE LITIGATION

13.    *From 1944 through the 1970's, Kaiser manufactured a variety of asbestos products, including joint compounds, finishing compounds, fibreboard and plastic cements. See Kaiser, 155 Cal. Rptr. 3d at 286.*

Response: Not disputed.

14.    *Beginning in the early 1980s, numerous plaintiffs began filing suits against Kaiser alleging bodily injury as a result of asbestos exposure. Kaiser tendered these claims to its primary insurers, including Truck, for indemnification and defense. Id.*

Response: Not disputed.

15.    *By 2001, Truck notified ICSOP and other excess carriers that its primary limits were exhausted, and brought an action against Kaiser in California state court seeking a declaration that it owed no further obligation to provide coverage for Kaiser's asbestos claims under its primary policies (the "California Coverage Litigation"). See id. at 286-287; DiCaprio Decl. ¶ 9.*

Response: Not disputed.

6

16. *In 2002, Kaiser filed a cross-complaint asserting counterclaims against its excess insurers, including ICSOP and certain London market insurers (the "London Market Insurers"), seeking a declaration that the excess insurers were obligated to defend and indemnify Kaiser for the asbestos bodily injury claims once primary coverage was exhausted. See Kaiser, 155 Cal. Rptr. 3d at 287; DiCaprio Decl. ¶ 10.*

Response: Not disputed.

17. *In 2005, the trial court issued a ruling adopting the "underlying cause test" as the proper method for determining the number of occurrences under the Truck primary policies, and finding that the asbestos bodily injuries for which Kaiser is legally liable did not, as a matter of law, arise from a single occurrence. See Truck Ins. Exchange v. Kaiser Cement and Gypsum Corp., No. BC249550, 2006 WL 5838335 (Sup. Ct. Cal. Dec. 13, 2006); DiCaprio Decl. ¶ 11.*

Response: Not disputed.

18. *In 2006, upon its own motion for reconsideration, the trial court reversed itself and found that Truck and Kaiser had intended to treat all asbestos bodily injury claims as a single occurrence under the policies. See Kaiser, 155 Cal. Rptr. 3d at 288; DiCaprio Decl. ¶ 12.*

Response: Not disputed.

19. *The excess insurers appealed, and, in 2007, the Court of Appeal, Second District, reversed the trial court, finding that the plain language of the policies did not support the conclusion that Kaiser's design, manufacture, and distribution of asbestos products was an*

*"occurrence," but rather the relevant "occurrence" was injurious exposure to asbestos products. See Kaiser, 155 Cal. Rptr. 3d at 288; DiCaprio Decl. ¶ 13.*

    <u>Response</u>: Not disputed.

        *20.     Following, the 2007 appellate decision, Truck moved for a determination of the number of "occurrences" at issue and, in January 2008, the trial court found that for purposes of further proceedings in the case, each asbestos bodily injury claim shall be deemed to have been caused by a separate and distinct occurrence within the meaning of the Truck policies. Kaiser, 155 Cal. Rptr. 3d at 289; DiCaprio Decl. ¶ 14.*

    <u>Response</u>: Not disputed.

        *21.     Pursuant to California precedent allowing an insured to target a single year of primary coverage within the exposure period to pay "all sums" due to a continuous injury claim such as asbestos, Kaiser selected the 1974 policy year, and, therefore, targeted the 1974 Truck Policy (which had no applicable aggregate limit). See Kaiser, 155 Cal. Rptr. 3d at 289; DiCaprio Decl. ¶ 15.*

    <u>Response</u>: Not disputed.

        *22.     Kaiser then moved for an order declaring that, if an asbestos bodily injury claim alleged against Kaiser involves exposure during the 1974 Truck Policy period, and Kaiser selects that year to respond, then the Excess Policy—and, if necessary, any excess policies directly above it—become liable for that claim once Truck has paid and exhausted its $500,000 per-occurrence limit for that claim, and Kaiser has paid its deductible. See Kaiser, 155 Cal. Rptr. 3d at 289; DiCaprio Decl. ¶ 16.*

    <u>Response</u>: Not disputed.

23.    ICSOP opposed Kaiser's motion, arguing that, under principles of "horizontal exhaustion," an excess insurer is not required to indemnify an insured before the limits of all applicable primary policies in the entire exposure period are exhausted—not just the limits of the underlying primary policy in the selected year. See Kaiser, 155 Cal. Rptr. 3d at 290; DiCaprio Decl. ¶ 17.

Response: Not disputed.

24.    In June 2008, the trial court agreed with Kaiser's argument that the "stacking" of primary policy limits was inappropriate and that Truck was liable for only one per occurrence limit on each claim under all of its primary policies. The trial court therefore held that once Truck exhausted its $500,000 per occurrence limit under the 1974 Truck Policy, coverage under the Excess Policy would attach. See Kaiser, 155 Cal. Rptr. 3d at 290; DiCaprio Decl. ¶ 18.

Response: Not disputed.

25.    Following the June 2008 coverage ruling, Kaiser, ICSOP and the London Market Insurers entered into a mediation, eventually resulting in a comprehensive settlement agreement executed on July 30, 2009 (the "Settlement"). The Settlement acknowledged that ICSOP intended to obtain appellate review of the June 2008 ruling upon entry of an appealable order. See DiCaprio Decl. ¶ 19.

Response: Not disputed.

26.    The Settlement set forth an interim funding arrangement subject to reallocation based on the outcome of the eventual appeal. See id.

Response: Not disputed.

27.   In February 2010, the trial court entered judgment for Kaiser and against ICSOP on Kaiser's cross-complaint and ICSOP timely appealed. See DiCaprio Decl. ¶ 22.

Response: Not disputed.

## ICSOP PROVIDES NOTICE TO ARGONAUT

28.   On June 3, 2009, ICSOP sent Argonaut a notice of loss under the Fac Cert with respect to the potential loss under the Excess Policy for Kaiser asbestos claims.  See Amer Decl., Ex. 4.

Response: Disputed.   The "Reinsurance Notice of Loss" dated June 3, 2009 did not provide notice of "the potential loss under the Excess Policy for Kaiser asbestos claims." Although it related to the Excess Policy, it provided notice of a $1 reserve with respect to a claimant named "Reynolds Jack".   It did not provide notice of the coverage action or settlement or of any reserve ICSOP had established on the master claim file for the Kaiser claim on the Excess Policy.  (Amer Decl. Ex. 4.)

29.   During the latter half of 2009, ICSOP sent Argonaut updated loss advices and itemized claims billings for all unsettled balances under the Fac Cert paid by ICSOP under the Settlement. See, e.g., Amer Decl, Exs. 5 - 11.

Response: Not disputed.

30.   In April 2010, Argonaut conducted an on-site audit of ICSOP's claim files for numerous risks, including, Kaiser. As part of this audit, Argonaut requested and

*received numerous documents related to the California Coverage Litigation, including the*
*Settlement. See Amer Decl. Ex. 1 at 180:15-22 and Ex. 13.*

<u>Response</u>: Disputed.  Argonaut did not receive "numerous" documents as a result of
the audit.  Argonaut received copies of 13 documents and does not believe it was provided
access to the master file for the Kaiser claim.  (Amer Decl. Ex. 13; Keely Opp. Decl. Ex. C
(Hollender Dep.) at 180-181.)

*31.   In December 2009, Argonaut advised ICSOP that it owed no obligation*
*to pay the Kaiser losses under the Fac Cert based upon, inter alia, a late notice defense. See*
*Amer Decl. Ex. 16.*

<u>Response</u>: Disputed.  In the December 2009 letter, Argonaut reserved its right to deny
payment on the basis of late notice.  (Amer Decl. Ex. 16; Keely Opp. Decl. Ex. C (Hollender
Dep.) at 150.)


**Additional Facts Material To ICSOP's Motion for Partial Summary Judgment**

32.   The Truck policy provided coverage through January 1, 1977.  (Keely
Decl. Ex. 27 at ICSOP0007340.)

33.   The ICSOP policy also provided coverage through January 1, 1977.
(Keely Decl. Ex. 27 at ICSOP0007340.)

34.   In addition to the 1974 ICSOP Policy, other affiliated member
companies within the American International Group ("AIG") issued more than a dozen
policies to Kaiser. (Keely Decl. Ex. 27 at ICSOP0007339 – 7441.)

35.     The policies issued by the AIG member companies to Kaiser provided coverage at various layers; some of them provided coverage at the same umbrella layer as the 1974 ICSOP Policy but in prior or subsequent years.  One of the other policies issued by AIG contained only per occurrence limits, like the 1974 ICSOP Policy, but most of the policies issued by AIG to Kaiser contained aggregate limits.  (Keely Decl. Ex. 27 at ICSOP0007339 – 7441.)

36.     By the late 1980s, Truck and Kaiser began to involve Kaiser's other insurers, including ICSOP.  (Keely Decl. Ex. 7.)  In 1988, a meeting was convened among representatives of Kaiser, Truck, and a number of insurance carriers.  Alicia Arencibia was an AIG representative who attended the meeting on behalf of AIG's primary and excess member companies.  (*Id.*)

37.     Following the meeting with representatives for Kaiser, Truck, and other insurance carriers, Alicia Arencibia wrote an internal memo to file, dated August 8, 1988, saying, "For those AIG Companies with excess coverage (see attached list) my recommendations are that files be created and reservation of rights be sent out immediately." (Keely Decl. Ex. 7 at ICSOP0031171.)  The list attached to the memo to file included the 1974 ICSOP Policy.  (*Id.*)

38.     By 1989, AIG had received notice of claim under the 1974 ICSOP Policy and had established a claim file for it.  (Keely Decl. Ex. 8.)

39.     Bart Tesoriero worked in the claims office for C.V. Starr.  (Keely Decl. Ex. 8.)  In an internal memo to file at the C.V. Starr claims office, dated March 28, 1989, he

recorded that he had reviewed "the various files for Kaiser Cement & Gypsum." (*Id.* at ICSOP0077033.) The "listing of open asbestos claims" attached to the memo included a claim number for the 1974 ICSOP Policy. (*Id.* at ICSOP0077035.)

40.    In his memo of March 28, 1989, Mr. Tesoriero noted, "My preliminary evaluation would be that in those periods where we are excess of $500,000 in underlying coverage we may face a very real possibility of some impairment." (Keely Decl. Ex. 8 at ICSOP0077034.) Mr. Tesoriero also stated, "In reviewing our files, I note that no reinsurance notifications have been sent by this office." (*Id.* at ICSOP0077033.)

41.    An internal AIG memo dated September 30, 1991 from the Toxic Tort Department to Management regarding a "Key Account Summary" of Kaiser claims stated, "AIG related companies have been put on notice for excess coverage." (Keely Decl. Ex. 9.)

42.    On or about July 25, 1996, AIG opened a claim file under the case number 170-016800 relating to claims against the 1974 ICSOP Policy. (Keely Decl. Ex. 10 at ICSOP0105088.)

43.    Case number 170-016800 was the "master" claim file for the 1974 ICSOP Policy from 1996 until at least 2002. (Keely Decl. Ex. 1 (DiCaprio Dep.) at 281-282, 303-304.)

44.    The physical claim file for case number 170-016800 contained a copy of the 1974 ICSOP Policy. (Keely Decl. Ex. 10.)

45.    Included with the copy of the 1974 ICSOP Policy in the file was a confirmation from C.V. Starr reflecting details of the reinsurance coverage from Argonaut

13

under the Facultative Certificate. (Keely Decl. Ex. 10 at ICSOP0105086.)

46.     Under AIG's claims practices, filling out a case creation sheet to open a claim file means that someone provided notice under the policy that is the subject of the claim file. (Keely Decl. Ex. 1 (DiCaprio Dep.). at 305.)

47.     Truck continued to handle the Kaiser asbestos claims into the early 2000s with contribution from other primary carriers, including National Union. (Keely Decl. Ex. 11 at ICSOP0075173 – 75174.)

48.     By early 2002, Truck's counsel advised AIG's counsel on the Kaiser claims, Lynberg & Watkins, that Truck intended to file suit against Kaiser to obtain a finding that Truck had exhausted its coverage and had no further obligation for the Kaiser asbestos claims. (Keely Decl. Ex. 11 at ICSOP0075174.))

49.     In February 2002, Simon Yoon was the claims handler at AIG handling the Kaiser account. (Keely Decl. Ex. 11)  On February 11, 2002, Mr. Yoon stated in an internal Format Report, "Truck's counsel has indicated that our excess policies will definitely be brought into this action between Truck and Kaiser." (*Id.* at ICSOP0075174.)

50.     On or about April 8, 2002, Kaiser filed a cross-complaint against its excess insurers in the Superior Court of the State of California seeking judgment of coverage under excess policies issued to it (the "Coverage Action"). (Keely Decl. Ex. 12.) ICSOP was named in the cross-complaint as cross-defendant, and the 1974 ICSOP Policy was identified as an excess policy at issue in the cross-complaint. (*Id.*)

51.     On or about August 20, 2002, Simon Yoon opened a claim file under

the case number 170-032752 relating to claims against the 1974 ICSOP Policy. (Keely Decl. Ex. 13.)

     52.     Claim number 170-032752 was designated as a new "master" claim file. (Keely Decl. Ex. 3 (Magnotta Dep.) at 123-124.)

     53.     In late 2004, Truck filed a summary judgment motion regarding the number of occurrences represented by the asbestos claims against Kaiser. (Keely Decl. Ex. 27 at ICSOP0007341.)

     54.     In its summary judgment motion, Truck took the position that all of the asbestos claims represented a single occurrence arising out of Kaiser's decision to manufacture asbestos products and that Truck's policy limits were, therefore, exhausted by the single occurrence. (Keely Decl. Ex. 14 at ARG00001206.)

     55.     Certain London-based insurers (the "London Market Insurers"), which had also issued excess coverage, took the lead in opposing Truck's motion. (Keely Decl. Ex. 14 at ARG00001206.)

     56.     The firm of Lynberg & Watkins represented the AIG member companies in the Coverage Action against Kaiser and Truck. (Keely Decl. Ex. 14.)

     57.     AIG took no position on Truck's motion for summary judgment. (Keely Decl. Ex. 14.)

     58.     In a letter to Tanja Fagan of AIG, dated December 12, 2005, AIG's counsel at Lynberg & Watkins explained the reason that AIG took no position as follows:



(Keely Decl. Ex. 14 at ARG00001206 – 1207.)

59. AIG's counsel at Lynberg & Watkins advised AIG in December 2005,



(Keely Decl. Ex. 14 at ARG00001217.)

60. Lynberg & Watkins reported to AIG that, in connection with the trial court's reconsideration of its prior decision, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Keely Decl. Ex 14 at ARG00001207.)

61. On or about January 10, 2006, the trial court issued a ruling and order, finding that all asbestos claims against Kaiser arose out of a single occurrence and granting summary judgment in favor of Truck that Truck's primary policies had been exhausted. (Keely Decl. Ex. 15.)

62. On or about ▮▮▮▮▮▮▮▮▮ AIG increased its indemnity reserve on the master file for the 1974 ICSOP Policy from a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ (Keely Decl. Ex. 26; Keely Decl. Ex. 1 (DiCaprio Dep.) at 146-147.)

63. At the time Kaiser filed its cross-complaint, there were 43 asbestos claimants whose damages exceeded $500,000, and Kaiser sought approximately $15,000,000

from ICSOP.  (Keely Decl. Ex. 27 at ICSOP0007343.)

64.    According to Lynberg & Watkins,  (Keely Decl. Ex. 16 at ICSOP0007543.)

65.    By March 2009, "there were 56 [asbestos claims] exceeding $500,000 and Kaiser sought approximately $24,400,000 from ICSOP, along with statutory interest of $3,500,000 and an unknown amount of attorneys fees."  (Keely Decl. Ex. 27 at ICSOP0007343.)

66.    An internal AIG Case Status Report, dated July 30, 2010, states, "[T]he fact remained that ICSOP had taken no action regarding the [asbestos claims] upon Truck's claimed exhaustion of limits such that a finding of breach of contract appeared likely." (Keely Decl. Ex. 27 at ICSOP0007343.)

67.    When the trial court in the Coverage Action proposed mediation, ICSOP agreed to mediate.  (Keely Decl. Ex. 27 at ICSOP0007343.)

68.    On or about ▮▮▮▮, Patrick DiCaprio, the claim handler at AIG managing the Kaiser account, submitted an Executive Claim Summary seeking authority ▮▮▮▮ on the master claim file for the 1974 ICSOP Policy.  (Ex. 18.)  The indemnity reserve on the master claim file for the 1974 ICSOP Policy was ▮▮▮ from ▮▮▮▮ on or about ▮▮▮▮.  (Keely Decl. Ex. 26; Keely Decl. Ex. 1 (DiCaprio Dep.) at 146-149.)

17

69.     On April 21 and 22, 2009, Ron Ryan of AIG participated in a mediation involving Truck, Kaiser, and the London Market Insurers. (Keely Decl. Ex. 19; Keely Decl. Ex. 1 (DiCaprio Dep.) at 215-216.)

70.     The result of the mediation was an agreement in principle for ███ to pay ██████ to resolve Kaiser's demand for amounts due on asbestos claims already settled by Kaiser through March 31, 2009. Kaiser agreed to accept ███ of that amount in payments from August 2009 through January 2010, and the parties agreed that the ███████ would be funded if the trial court's June 2008 coverage decision was affirmed on appeal. ████ also agreed to pay amounts in excess of █████ on pending or future asbestos claims. The ███████████ agreed to fund ███ of the settlement amount for the past claims and 50% of any amounts paid on pending and future claims. (Keely Decl. Ex. 27 at ICSOP0007343 – 7344.)

71.     For a number of years prior to 2009, Argonaut had difficulties with AIG reporting claims late, and Argonaut attempted over the years to address the issue with AIG. (Keely Decl. Ex. 2 (Hollender Dep.) at 61-62, 123-125; Keely Decl. Ex. 4 (Stuhr Dep.) at 95-96.)

72.     In 2008, Chris Hollender of Argonaut asked reinsurance executives at AIG if AIG would give Argonaut access to certain "ground-up studies" on AIG's asbestos exposures that AIG had reported were prepared by consultants at Milliman. (Keely Decl. Ex. 17.)

73.     Mr. Hollender stated in an email to the Irwin Nirenberg and Chris

Magnotta of AIG:

> While we've heard over the past year that AIG has been discussing internally ways
> to improve reinsurance reporting, it has yet to come to fruition.  It would seem to
> me that by providing access to these studies, we can move beyond where we are
> now.  As I mentioned, we are simply trying to get a handle on Argonaut's potential
> liabilities so that it can be in the best position to make informed financial
> decisions.
>
> Over the past several years, Argonaut has been forced to add a substantial amount
> in reserves as a result of continued deterioration involving its assumed reinsurance
> runoff operation, and our reinsurance of AIG has been a significant contributing
> factor.  AIG's inability to report losses in a timely fashion has caused financial
> issues for Argonaut, and, unless the situation improves, has the potential to cause
> significant harm to Argonaut in the future.

(Keely Decl. Ex. 17 at ARG00003660.)   Irwin Nirenberg of AIG responded to the email

proposing to arrange a conference call with Argonaut.  (*Id.*)

74.    AIG never agreed to provide Argonaut with access to the Milliman

studies.  (Keely Decl. Ex. 2 (Hollender Dep.) at 152-153.)

75.    Argonaut received its first notice of the Kaiser claim from AIG in April

2009.  (Keely Decl. Ex. 20; Keely Decl. Ex. 2 (Hollender Dep.) at 43-44.)

76.    The notice received in April 2009 was sent by AIG's broker, Guy

Carpenter, with a caption of "Initial Loss Advice."  (Keely Decl. Ex. 20 at ICSOP0000032.)

77.    The Initial Loss Advice received by Argonaut in April 2009 did not

refer to the Facultative Certificate.  It referred to an excess of loss reinsurance treaty on which

Argonaut participated that covered policies issued by ICSOP in 1974, including the 1974

ICSOP Policy.  (Keely Decl. Ex. 2 (Hollender Dep.) at 43-44.)

78.    Nadine Stuhr of Argonaut wrote to Linda Sefranka in the reinsurance

department at AIG on April 3, 2009. Ms. Stuhr attached a copy of the Initial Loss Advice and advised that the "broker has reported the initial loss to Argonaut with a reserve recommendation of over ████ but no supporting loss information was provided." She asked AIG to provide copies of any internal reports to summarize the loss as well as copies of the applicable policies. (Keely Decl. Ex. 20 at ICSOP0000031.)

79.     Ms. Sefranka responded to Ms. Stuhr on April 27, attaching a copy of the 1974 ICSOP Policy and a "Status Report," dated April 22, 2009. (Keely Decl. Ex. 21.) In a section entitled "Declaratory Judgment," the only thing that the Status Report reported was: "There is an active Declaratory Judgment action in which all coverage issues are being litigated." (*Id.* at ICSOP0000043.)

80.     The Status Report provided by AIG to Argonaut on April 27, 2009 did not include any information regarding the court decisions in the Coverage Action or regarding AIG's negotiation and settlement in principle. (Keely Decl. Ex. 21.)

81.     In June 2009, Argonaut received a copy of a "Reinsurance Notice of Loss" regarding the Facultative Certificate. (Keely Decl. Ex. 22.)  That document was received by Argonaut "without any cover sheet or supporting documentation." (Keely Decl. Ex. 22; Keely Decl. Ex. 25.)

82.     On July 9, 2009, ICSOP's broker at Guy Carpenter emailed Argonaut an "Initial Notice of Loss & Payment Request" relating to the Facultative Certificate. (Keely Decl. Ex. 23.)

83.     Following Argonaut's receipt of the Initial Loss Advice on the excess

of loss treaties in April 2009, Argonaut identified in its own records that it had issued the Facultative Certificate also covering the 1974 ICSOP Policy.  By early May 2009, Argonaut had identified the certificate.  (Keely Decl. Ex. 4 (Stuhr Dep.) at 35.)

84.     Even though AIG had still not yet provided notice of any claim on the certificate by May 2009, Argonaut determined to provide notice to its retrocessionaires of the potential for a claim.  (Keely Decl. Ex. 2 (Hollender Dep.) at 65-66.)

85.     Argonaut made the decision to notify its retrocessionaires, even though Argonaut had not yet received specific notice under the Facultative Certificate, "because notice is such an important issue."  (Keely Decl. Ex. 2 (Hollender Dep.) at 67.)

86.     Ms. Stuhr of Argonaut raised AIG's late notice of the claim (under both the Facultative Certificate and the excess of loss treaty) in June 2009 and again in July and August 2009.  (Keely Decl. Ex. 24 at ICSOP0065819 – 65821; Ex. 25.)

87.     On August 3, 2009, Barbara Obecny of AIG sent an email to AIG's broker purporting to address "the late notice issue" on the Facultative Certificate.  She stated that the reserve ███████ on the Kaiser claim up to ███████ in ███████████ should have triggered a notice to Argonaut at that time.  "However a review of the reinsurance layoff indicates that until 5/1/2009 no facultative reinsurance was on the layoff in SCI."  (Keely Decl. Ex. 26.)

88.     "SCI" is a computer system used by AIG's reinsurance department since 2003, which generated notices of claims to reinsurers.  A predecessor system called "LMS" was in place since the late 1980s and operated on the same basis as SCI with respect

to generating notices.  (Keely Decl. Ex. 3 (Magnotta Dep.) at 80.)

89.    Chris Magnotta, a reinsurance director at AIG, reviewed the Kaiser master claim file in April 2009 and made a request for reinsurance layoff information for the 1974 ICSOP Policy.  Seeing the information, he recognized that the Argonaut facultative certificate was not identified as part of the reinsurance in SCI.  (Keely Decl. Ex. 3 (Magnotta Dep.) at 93-93.)

90.    Argonaut had entered into a Special Participating Excess Reinsurance Agreement with a number of retrocessionaires.  The retrocession agreement is referred to as "Treaty X."  (Keely Decl. Ex. 2 (Hollender Dep.) at 63-64; Keely Decl. Ex. 6.)

91.    Treaty X applied on a quota share basis, meaning that the retrocessionaires would accept their percentage of losses on any policy ceded to the treaty, including losses under the Facultative Certificate.  (Keely Decl. Ex. 2 (Hollender Dep.) at 62-65.)

92.    Between 2001 and 2009, Argonaut had agreed to commute with ████████ of the retrocessionaires that participated on Treaty X.  (Keely Decl. Ex. 2 (Hollender Dep.) at 200-202, 220-221, 233-254; Keely Decl. Ex. 6.)

93.    If Argonaut had been given timely notice of the Kaiser claim, those commutations could have been avoided or Argonaut would have increased its demand before giving its retrocessionaires a release on Treaty X.    (Keely Decl. Ex. 2 (Hollender Dep.) at 207-209.)

94.    Argonaut determined a price to charge for a commutation by reviewing

the paid balances due from the retrocessionaire and the case reserves for claims that reinsureds had notified to Argonaut. (Keely Decl. Ex. 2 (Hollender Dep.) at 206.) Based on the inventory of paid claims and case reserves for noticed claims, Argonaut would attempt to develop a figure for IBNR (*i.e.*, claims that are Incurred But Not Reported). (*Id.*) The figure used for IBNR was not "just picking out a number out of a hat", but instead "was really grounded on looking at claims that are open and going year by year." (*Id.* at 231-233.)

95.    Argonaut did not insure Kaiser directly and did not reinsure any company that insured Kaiser other than AIG. (Keely Decl. Ex. 2 (Hollender Dep.) at 219-220, 80-81.)

96.    The Kaiser claim as ceded by ICSOP under the Facultative Certificate is the largest facultative claim that Chris Hollender, who has been at Argonaut since 1997, has ever seen in Argonaut's book of business. (Keely Decl. Ex. 2 (Hollender Dep.) at 210-211.)

New York, New York
June 7, 2013

Respectfully Submitted,

By: _____
        Sean Thomas Keely
        Benjamin J.O. Lewis
        Pooja Boisture
875 Third Avenue
New York, New York 10022
Tel: (212) 918-3000
Fax: (212) 918-3100
sean.keely@hoganlovells.com
ben.lewis@hoganlovells.com
pooja.boisture@hoganlovells.com

*Attorneys for Defendant*
*Argonaut Insurance Company*