UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
THE INSURANCE COMPANY OF THE STATE OF    :
PENNSYLVANIA,                            :
                        Plaintiff,       :      12 Civ. 6494 (DLC)
                                        :
             -v-                        :      OPINION AND ORDER
                                        :
ARGONAUT INSURANCE COMPANY,              :
                                        :
                        Defendant.       :
                                        :
----------------------------------------X

Plaintiff:

Andrew S. Amer
Rae C. Adams
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017

Defendant:

Sean Thomas Keely
Benjamin J.O. Lewis
Pooja Boisture
Hogan Lovells U.S. LLP
875 Third Avenue
New York, New York 10022

DENISE COTE, District Judge:

        In this non-jury action, the plaintiff Insurance Company of
the State of Pennsylvania ("ICSOP") sues to enforce the terms of
a reinsurance contract against defendant Argonaut Insurance
Company ("Argonaut").  In the reinsurance contract, Argonaut
agreed to reinsure ICSOP for a portion of an excess insurance
policy ICSOP had issued to Kaiser Cement Corporation ("Kaiser").
Following discovery limited to Argonaut's affirmative defense of

1

late notice, the parties cross-moved for summary judgment on this defense.

For the following reasons, Argonaut's motion is granted in part.  This Opinion identifies California law as the law which will govern this defense.  There is no material issue of fact which precludes a finding that ICSOP breached its contractual obligation to provide timely notice to Argonaut.  The obligation to provide notice arose no later than 2002, but ICSOP did not provide notice until 2009.  A trial will be held to determine whether Argonaut can demonstrate that it suffered actual and substantial prejudice from the breach, and whether ICSOP's gross negligence or bad faith excuses Argonaut from demonstrating prejudice.


BACKGROUND

The following facts are undisputed unless otherwise noted. Many years prior to the instant litigation, nonparty Kaiser manufactured products containing asbestos.  From 1953 through 1987, Kaiser purchased primary, umbrella, and excess insurance policy coverage from a number of insurance companies.

Primary Insurance Policy

Kaiser acquired comprehensive general liability insurance from Truck Insurance Exchange ("Truck" or "Primary Insurer") through a primary insurance policy that commenced on January 1,

1974 (the "Truck Policy").  The Truck Policy provided coverage through January 1, 1977.  It limited Kaiser's recovery to $500,000 per "occurrence" but contained no aggregate limit on the sums Truck could be required to pay for multiple occurrences during the policy period.

Excess Insurance Policy

Kaiser also acquired excess umbrella insurance from ICSOP ("1974 ICSOP Policy"), a Pennsylvania insurance company with its principal place of business in New York City, for the same policy period as the Truck Policy.  The 1974 ICSOP Policy provided so-called "umbrella" coverage above the $500,000 Truck primary limit up to a limit of $5,000,000 per occurrence.  Like the Truck Policy, however, the 1974 ICSOP Policy contained no aggregate limit.  The 1974 ICSOP Policy was not the only insurance policy issued to Kaiser by an AIG member company.  In total, AIG member companies issued over a dozen insurance policies to Kaiser.  For the most part, the other policies contained annual aggregate limits.

Reinsurance Policy

The 1974 ICSOP Policy was issued to Kaiser by ICSOP's underwriting manager -- another AIG company -- C.V. Starr & Co. ("C.V. Starr") out of its California office.  Thereafter, C.V. Starr, on behalf of ICSOP, requested facultative reinsurance from Argonaut, an Illinois insurance company with its principal place

3

of business in San Antonio, Texas, for the 1974 ICSOP Policy.[1]
In response to C.V. Starr's request, Argonaut issued a
facultative certificate (the "Facultative Certificate") in which
Argonaut agreed to reinsure 20% of the 1974 ICSOP Policy's
$5,000,000 limit -- or, in other words -- $1,000,000 per
occurrence.  The policy was issued from Argonaut's then-home
office in Menlo Park, California.  It was subsequently delivered
through the California office of AIG's reinsurance broker Guy
Carpenter to C.V. Starr's California Office.  In exchange for
agreeing to reinsure 20% of the 1974 ICSOP Policy, Argonaut
received a proportionate share of the premium paid on that
policy.

     Under the Facultative Certificate, Argonaut's liability
"follow[s] that of [ICSOP]" and "upon receipt of a definite
statement of loss" from ICSOP, Argonaut is instructed to
"promptly pay its proportion of such loss."  Like many
reinsurance contracts, the Facultative Certificate requires ICSOP
to give prompt notice to Argonaut that its reinsurance

---

[1] Facultative reinsurance is one of two principle types of
reinsurance.  Reinsurance enables one insurer -- called the
ceding insurer or reinsured -- to cede "all or part of the risk
it underwrites" to another insurance company.  Unigard Sec. Ins.
v. North River Ins. Co., 4 F.3d 1049, 1053 (2d Cir. 1993)
("Unigard II").  It is colloquially referred to as insurance for
insurance companies.  Facultative reinsurance allows the
reinsured to cede risk on a specific insurance policy that is
identified in the reinsurance agreement.  The other principal
type of reinsurance is treaty reinsurance, through which the
reinsured cedes risk on identified classes of the reinsured's
policies.

4

obligations may be triggered:

> [ICSOP] shall notify [Argonaut] promptly of any
> occurrence which in the Company's estimate of the value
> of injuries or damages sought, without regard to
> liability, might result in judgment in an amount
> sufficient to involve this certificate of reinsurance.
> [ICSOP] shall also notify [Argonaut] promptly of any
> occurrence in respect of which [ICSOP] has created a
> loss reserve equal to or greater than fifty (50)
> percent of [ICSOP's] retention specified in Item 3 of
> the Declarations; or, if this reinsurance applies on a
> contributing excess basis, when notice of claim is
> received by the Company.

The Facultative Certificate applies on a "contributing

excess" basis, which means that Argonaut's liability "applies

proportionately to all loss within" the policy's limit.[2]   The

Certificate also granted Argonaut the "right to associate" in the

defense and control of any claim, suit or proceeding involving

the Facultative Certificate:

> While the Reinsurer does not undertake to investigate
> or defend claims or suits, it shall nevertheless have
> the right and shall be given the opportunity, with the
> full cooperation of the Company, to associate counsel
> at its own expense and to join with the Company and its
> representatives in the defense and control of any
> claim, suit or proceeding involving this certificate of
> reinsurance.

## 1980-1996: Kaiser Asbestos Litigation

As the deleterious effects of asbestos came to light in the

1980s, Kaiser began to face thousands of lawsuits alleging bodily

injury and property damage caused by its asbestos-laden products.

Truck, as one of four of Kaiser's primary insurers, initially

---

[2] In contrast, excess of loss reinsurance covers losses exceeding
a specified amount.

handled many of the asbestos claims asserted against Kaiser.  In 1988, Kaiser, Truck, and other insurance carriers attended a meeting to discuss the possibility of a cost-sharing arrangement. Alicia Arencibia ("Arencibia"), an AIG employee, attended the meeting on behalf of National Union Fire, one of Kaiser's primary insurers.  Following the meeting, Arencibia wrote an internal memorandum, dated August 8, 1988, which stated that "[f]or those AIG Companies with excess coverage (see attached list) my recommendations are that files be created and reservation of rights be sent out immediately."  The 1974 ICSOP Policy was among the policies contained in the list attached to the memorandum.

The following year, in an internal memorandum dated March 28, 1989, Bart Tesoriero, a claims office employee of C.V. Starr, stated that he had reviewed "the various files for Kaiser Cement & Gypsum," and noted that "no reinsurance notifications [had] been sent by this office."  He further stated that "[m]y preliminary evaluations would be that in those periods where we are excess of $500,000 in underlying coverage we may face a very real possibility of some impairment."  Tesoriero attached a list of "open asbestos claims as of March 29, 1989."  The list included a claim number for the 1974 ICSOP Policy.  Several years later, in 1991, the Toxic Tort Department of AIG sent a "Key Account Summary" of Kaiser claims to AIG management, which stated that "AIG related companies have been put on notice for excess

coverage." Despite these documents from the period between 1988 to 1991 which indicate an awareness by C.V. Starr and components of AIG that excess coverage would be affected by asbestos claims against Kaiser, no steps were taken to give notice to Argonaut.

In 1996, AIG created a master claim file for claims against the 1974 ICSOP Policy. The master case file was assigned case number 170-016800 and the physical file with this case number contained a copy of the 1974 ICSOP Policy and a confirmation from C.V. Starr reflecting details of the reinsurance coverage provided under Argonaut's Facultative Certificate.[3] ICSOP explains that the opening of a claim file is triggered by the receipt of "notice" under a policy. In the present context, this means that, as of 1996, AIG had received notice under the 1974 ICSOP Policy.[4] AIG did not provide notice to Argonaut at this

_____

[3] From the 1980's to the present, ICSOP has used automated systems for providing notice to reinsurers. Because the 1974 ICSOP Policy was issued before ICSOP adopted an automated system, the reinsurance agreement was originally recorded on a layoff sheet -- which ordinarily lists all of the applicable reinsurance for the underlying policy. At some point, ICSOP explains, the layoff sheet would have been coded into the automated system. Evidently, the Facultative Certificate was not coded into the automated system. ICSOP further explains that, had the Facultative Certificate been coded into the automated system, notice would have been generated as soon as a claim file was opened.

[4] Receipt of notice under a policy, ICSOP further explains, is distinct from receipt of "notice of a claim" tendered under the policy. The 1974 ICSOP Policy required Kaiser to give notice of an occurrence to ICSOP as follows: "Whenever the Insurance Manager or a representative of the Insurance Department of the Insured has information from which it may be reasonably concluded that an occurrence covered hereunder involves injuries or

7

time that it had received notice under a policy.

2001-2009: California Coverage Action

    In 2001, Truck notified ICSOP and other excess carriers that
its primary limits were exhausted.  At this time, ICSOP did not
notify Argonaut of the potential impairment of the Facultative
Certificate.  Truck proceeded to initiate a declaratory judgment
action against Kaiser in California state court in order to
establish that it owed no further obligation to provide coverage
for Kaiser's asbestos claims under its primary policies
("California Coverage Action").  In February 2002, Truck's
counsel informed AIG that its excess policies would "definitely
be brought into" the Coverage Action between Truck and Kaiser.
Two months later, on April 8, 2002, Kaiser filed a cross-
complaint against ICSOP and other excess insurers.  ICSOP and
other AIG member companies were represented in the Coverage
Action by the firm of Lynberg & Watkins.  In August 2002, an AIG
claims handler designated a new "master" claim file for claims
against the 1974 ICSOP Policy.  Following these events, ICSOP
still did not send notice to Argonaut under the Facultative
Certificate.

    In 2004, Truck filed a motion for summary judgment that
sought, among other things, a declaration that the asbestos
claims asserted against Kaiser constituted a "single occurrence."

---

damages, which, in the event that the Insured shall be liable, is
likely to involve this policy, notice shall be sent to C.V. Starr

Because the 1974 Truck Policy had occurrence limits, but no aggregate limits, a finding that the asbestos claims constituted a single occurrence would dramatically reduce the amount Truck would have to pay on Kaiser's claims before its limits were exhausted.  The London Market Insurers, other providers of excess coverage, opposed Truck's motion and argued that each asbestos bodily injury claim constituted a separate occurrence.  For its part, Kaiser made submissions to the court that agreed with Truck's position that the asbestos claims constituted a single occurrence, but argued, in the alternative, that the number of occurrences should be limited to two or three occurrences.

Counsel for the AIG member companies, including ICSOP, decided to take no position on Truck's motion.  The rationale behind the decision was explained as follows:

> The AIG Member Companies took no position on Truck's Motion, as there are inherent conflicts between the umbrella and excess coverage issued by these Companies to Kaiser.  Specifically, while most of the excess policies issued by the AIG Member Companies would benefit from a multiple occurrence finding, i.e., by prolonged exhaustion of the primary coverage, the first layer umbrella policies issued by Insurance Company of the State of Pennsylvania ("ICSOP"), which have no aggregate limits, would face increased exposure from a multiple occurrence finding.

(emphasis in original).  AIG's counsel recognized that "[s]hort of a number of occurrences ruling that obligates Truck to fund a significant portion of the [asbestos bodily injury claims], a one occurrence ruling appears to be the most beneficial to ICSOP in

& Company . . . as soon as practicable."

terms of limits and prolonged exposure for the [asbestos bodily injury claims]."

In 2005, the California trial court issued an Opinion denying Truck's motion for summary judgment.  In the Opinion, the court adopted the "underlying cause test" as the method for determining the number of occurrences represented by the asbestos claims asserted against Kaiser.  While the court concluded that disputed issues of fact precluded a determination of exact number of occurrences, it also ruled as a matter of law that the asbestos claims did not constitute a single occurrence.

In 2006, the trial court decided to reconsider its 2005 ruling and called for supplemental briefing.  This time AIG's counsel submitted a brief urging the trial court to deny Truck's motion for summary judgment on the basis that disputed issues of material fact precluded summary adjudication.  AIG's submission did not take a position on the number of occurrences presented by the Kaiser asbestos claims.  On January 10, 2006, the trial court reversed its 2005 ruling and concluded that Truck and Kaiser intended to treat all asbestos bodily injury claims as a single occurrence under the Truck policies.  Its conclusion was based, in part, on a determination that Kaiser's design, manufacture, and distribution of asbestos products constituted the single underlying cause of the asbestos bodily injury claims.  In August 2006, AIG increased its indemnity reserve on the master file for

the 1974 ICSOP Policy from $5 up to $249,995.

The London Market Insurers appealed the trial court's decision and in January 2007 the appellate court reversed the trial court's decision.  See London Market Insurers v. Superior Court, 146 Cal.App.4th 648 (Cal. Ct. App. 2007); see also Kaiser Cement and Gypsum Corp. v. Insur. Co. of the State of Penn., 155 Cal.Rptr.3d 283 (Cal. Ct. App. 2013).  The appellate court found that "the plain language of the policies was not susceptible of the conclusion that Kaiser's design, manufacture, and distribution of asbestos products was an 'occurrence.'"  London Market Insurers, 146 Cal.App.4th at 672.  Instead, it concluded that "the relevant 'occurrence' was injurious exposure to asbestos products."  Id.  On remand, in January 2008, the California trial court held that "the claim of each asbestos bodily injury claimant shall be deemed to have been caused by a separate and distinct occurrence within the meaning of Truck policies."

Pursuant to California precedent which allowed an insured to select a single year of coverage within an exposure period to respond to claims resulting from a continuous injury, Kaiser selected the 1974 policy year.  Truck's 1974 Policy, as mentioned, had no aggregate limit.  Kaiser then sought a declaration from the trial court that "if any asbestos bodily injury claim alleged against Kaiser triggers the primary policy

of comprehensive general liability issued by Plaintiff [Truck]
for the year 1974, and Kaiser selects that policy year to
respond, then the first-level umbrella policy issued by Cross-
Defendant [ICSOP] incepting January 1, 1974 -- and, if necessary,
any excess policies directly above it -- become liable for that
claim once Truck has paid and exhausted its $500,000 per-
occurrence limit for that year, and Kaiser has paid its $5,000
deductible for that year." Kaiser Cement and Gypsum Corp., 155
Cal.Rptr.3d at 289.  ICSOP opposed Kaiser's motion, arguing that
principles of "horizontal exhaustion" require an insured to
exhaust the limits of all applicable primary policies covering
the entire exposure period -- rather than simply exhausting the
limits of a primary policy for a single targeted year -- before
an excess insurer can be required to indemnify the insured.  Id.

    In June 2008, the trial court held that once Truck exhausted
its $500,000 per occurrence limit under the 1974 Truck Policy,
coverage under the 1974 ICSOP Policy would attach, and that
horizontal exhaustion or "stacking" of primary policy limits was
not appropriate.  Following this ruling, Kaiser, ICSOP and the
London Market Insurers decided to participate in mediation.  In
March 2009, the indemnity reserve on the master claim file for
the 1974 ICSOP Policy was increased from $249,995 to $5,000,000.
Once again, through the entire course of these proceedings, ICSOP
did not notify Argonaut pursuant to the Facultative Certificate.

Mediation sessions took place on April 21 and 22, 2009. The mediation resulted in an interim settlement agreement ("Settlement Agreement") that was subject to ICSOP's appeal of the trial court's horizontal exhaustion ruling. Pursuant to the Settlement Agreement, ICSOP agreed to pay millions of dollars in satisfaction of Kaiser's demand for amounts owed on asbestos claims already settled by Kaiser through March 31, 2009. The Settlement Agreement called for ICSOP to make installment payments of half of that amount between August 2009 and January 2010. The Agreement further contemplated that the funding of the remaining money would be contingent on the outcome of the appeal of the trial court's decision. Although the trial court's decision essentially relieved the London Market Insurers of any direct indemnification responsibility, the London Market Insurers agreed to fund 40% of the settlement amount for past claims and 50% of any amounts paid on pending and future claims.[5] The Settlement Agreement was executed in July 2009.

2001-2009: Argonaut Executes Commutation Agreements with Retrocessionaires

Argonaut had itself ceded some of the risk it had underwritten in the Facultative Certificate and other policies,

---

[5] Although the record is less than clear on this point, the parties appear to agree that ICSOP would have been entitled to seek contribution from the London Market Insurers had they not agreed to shoulder a portion of the settlement funding. It also appears that ICSOP may still be entitled to seek contribution from other insurers that did not participate in the settlement.

to its own reinsurers -- known as retrocessionaires -- through a Special Participating Excess Reinsurance Agreement ("Treaty X"). Treaty X applied on a quota share basis, thereby requiring the retrocessionaires to accept their percentage of losses on any policy ceded to the treaty.  Between 2001 and 2009, Argonaut entered into roughly a dozen commutation agreements with retrocessionaires who participated in Treaty X.  A commutation agreement is a type of settlement agreement through which the retrocessionaires' reinsurance obligations are terminated in return for the retrocessionaires agreeing to pay a stipulated amount to the first level reinsurer -- in this case, Argonaut. Through these commutation agreements, Argonaut released roughly 23% of its reinsurance coverage.

In order to determine the price to charge for commutations, Argonaut explains, it begins by considering paid balances due from the retrocessionaires along with ceded case reserves.[6]  It also tries to estimate a figure called IBNR, which stands for "incurred but not reported."  This figure, according to Argonaut, is "really grounded on looking at claims that are open and going year by year."  Argonaut argues that with earlier notice from ICSOP it could have (1) avoided the commutation agreements; or (2) charged higher prices for its commutation agreements. Notably, the evidence submitted by Argonaut strongly suggests

---

[6] A case reserve is an insurer's estimate of the amount it will ultimately need to pay on a particular claim or group of claims.

14

that the latter possibility was more likely than the former.[7]

Notice to Argonaut

Over the course of 2009, ICSOP provided Argonaut with its first notice of loss under the Facultative Certificate.  In April 2009, AIG's broker, Guy Carpenter, sent Argonaut an "Initial Loss Advice."  The Facultative Certificate was not referenced in the loss advice.  Instead, the loss advice referred to a loss reinsurance treaty between Argonaut and ICSOP that, like the Facultative Certificate, covered the 1974 ICSOP Policy.  On April 3, after Argonaut received the loss advice, Nadine Stuhr, an Argonaut employee, wrote to the reinsurance department at AIG to request additional information about the loss.

On April 27, an AIG representative responded by email, attaching a copy of the 1974 ICSOP Policy and a Status Report dated April 22, 2009.  The Status Report included a section entitled "Declaratory Judgment," which stated simply: "There is an active Declaratory Judgment action in which all coverage issues are being litigated."  Following receipt of the loss advice, Argonaut searched its own records and determined that it

---

[7] When asked if there were any commutation agreements Argonaut would have avoided had notice been given sooner, Christopher Hollender -- Argonaut's Vice President -- responded "There's a few -- I don't know that there's any that we necessarily would have avoided, but I think we would have increased our demand for that release on the Treaty X program."  In addition, when asked whether it was Argonaut's position that there is a commutation agreement it would not have entered into if it had been given earlier notice, Hollender responded "It's hard to say.  I think

had also issued the Facultative Certificate, and that the Facultative Certificate also covered the 1974 ICSOP Policy. Accordingly, in May, Argonaut sent notice to its retrocessionaires, alerting them to the possibility that claims would be made.

Then, on June 3, 2009, Argonaut received a copy of a "reinsurance Notice of Loss."  Unlike the loss advice, the notice of loss did reference the Facultative Certificate.  But, the notice of loss did not reference the California Coverage Action, nor did it mention ICSOP's settlement negotiations with Kaiser and the London Market Insurers.  In December 2009, Argonaut sent a letter to ICSOP advising that Argonaut reserved its right to deny payment on the basis of late notice.  This action followed.

The instant action was originally filed in the Supreme Court of the State of New York, and was removed to this Court by Argonaut on August 24, 2012.  Following discovery limited to the existence of prejudice from any delay in ICSOP's provision of notice to Argonaut, the parties filed motions for summary judgment.  The parties' motions were fully submitted on June 14, 2013.


DISUCSSION

A motion for summary judgment may be granted only if the

_____

the pricing would have been different.  I don't know that it would have been different all along."

submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In deciding whether a party is entitled to summary judgment the Court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000). When, as here, the parties present cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Heublein Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993). The substantive law governing the case will identify those issues that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1987). Thus, in order to decide whether to grant summary judgment, this Court must determine (1) whether a genuine factual dispute exists based on the admissible evidence in the record, and (2) whether the facts in dispute are material based on the substantive law at issue.

I. Choice of Law

In a case grounded in diversity jurisdiction, a federal

court "must apply the choice of law analysis of the forum state." GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc., 449 F.3d 377, 382 (2d Cir. 2006). Under New York law, when the law of more than one state is potentially applicable to the parties' dispute, the threshold question is whether the applicable rules of the competing jurisdictions actually conflict. Licci ex rel. Licci v. Lebanese Canadian Bank, 672 F.3d 155, 157 (2d Cir. 2001). An actual conflict exists where "the applicable law from each jurisdiction provides different substantive rules." Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 142 (2d Cir. 2004). "If no actual conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply New York law." Licci, 672 F.3d at 157.

If an actual conflict exists, the court must proceed to apply New York's choice of law rules to determine which jurisdiction's law should govern the parties' dispute. In cases like the present one, where the parties' dispute arises out of a contract, New York courts rely on the "center of gravity" or "grouping of contacts" choice of law theory. Auten v. Auten, 308 N.Y. 155, 160 (1954). "Under this approach, the spectrum of significant contacts -- rather than a single possibly fortuitous event -- may be considered." Matter of All State Ins. Co., 81 N.Y.2d 219, 226 (1993). In selecting the jurisdiction with the most significant relation to the transaction and the parties,

18

courts consider "the place of contracting, the places of
negotiation and performance, the location of the subject matter,
and the domicile or place of business of the contracting
parties." Kaszak v. Liberty Mut. Ins Co., 744 N.Y.S.2d 286, 287
(2d Dep't 2002).

     Both New York and California have ties to the instant
litigation, making the law of each jurisdiction potentially
relevant.  If it were necessary to apply New York's choice of law
analysis, the parties appear to agree that California has the
strongest connection.  The parties' agreement is well-founded.
The Facultative Certificate was issued and delivered in
California.  Kaiser, the underlying insured, was also located in
California.  Moreover, at the time of contracting, Argonaut's
home office was located in California, making it likely that the
parties intended, at that time, that ICSOP's requests for payment
would be submitted in California.  The other potentially
interested jurisdictions -- Pennsylvania, Texas, and New York --
have admittedly thinner connections to the parties and the
Facultative Certificate.  Accordingly, to the extent California
and New York law conflict, the Court will apply California law in
addressing the parties' dispute.  The parties dispute, however,
whether the substantive rules of New York and California actually
conflict on any issues relevant to the present litigation.

     While Argonaut argues that there are no relevant conflicts

between New York and California law, ICSOP posits roughly three conflicts between the two states' treatment of notice issues in the reinsurance context.  Specifically, ICSOP contends that (1) under California law the reinsurer must always demonstrate prejudice from late notice, even if the reinsured acted in bad faith by failing to give timely notice; (2) California's standard for prejudice is more demanding; and (3) California law recognizes constructive notice.

Despite this dispute, the parties recognize that the law of reinsurance is essentially identical in California and New York and both draw freely from precedent in the two jurisdictions. Similarly, California courts frequently rely on decisions from circuits other than the Ninth Circuit, and from other states' courts of appeal.  In light of the general uniformity in reinsurance law across jurisdictions, the only area in which the substantive law of the New York and California may be in conflict is the issue of constructive notice.  While it is not entirely clear that New York would recognize constructive notice to the reinsurer, California does.  Therefore, because California has the greater interest in the parties' dispute, California law will be applied.  Where California law is unknown, unsettled, or ambiguous, however, this Court is free to seek guidance from New York case law, and the case law of other jurisdictions in attempting to predict what New York courts would predict

California courts would hold if faced with the issues encountered here.  See Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir. 1989).  It should be noted, however, that the application of New York law to the discussion that follows would not alter the outcome.

II. Late Notice

Argonaut argues that ICSOP should have provided it with notice in 1989 or no later than April 2000.  Under California law, insurance agreements are subject to "the ordinary rules of contractual interpretation."  Employers Reinsurance Co. v. Superior Court, 161 Cal.App.4th 906, 919 (Cal. Ct. App. 2008)(citation omitted).  "Thus, the mutual intention of the contracting parties at the time the contract was formed governs."  London Market Insurers v. Superior Court, 146 Cal.App.4th 684, 656 (Cal. Ct. App. 2007).  The intention of the parties is inferred solely from the written provisions of the contract, if possible.  Great Western Drywall, Inc. v. Interstate Fire & Cas. Co., 161 Cal.App.4th 1033, 1040 (2008).  In construing contract language, words are interpreted in "their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage."  Employers Reinsurance Co., 161 Cal.App.4th at 919 (citation omitted); see also Berger v. New York State Dep't of Social Services, 181 N.Y.S.2d 238, 240 (3d Dep't 1992).

For ease of reference, the notice provision of the

Facultative Certificate is repeated here:

> [ICSOP] shall notify [Argonaut] promptly of any
> occurrence which in [ICSOP's] estimate of the value of
> injuries or damages sought, without regard to
> liability, might result in judgment in an amount
> sufficient to involve this certificate of reinsurance.
> The Company shall also notify [Argonaut] promptly of
> any occurrence in respect of which the Company has
> created a loss reserve equal to or greater than fifty
> (50) percent of [ICSOP's] retention specified in Item 3
> of the Declarations; or, if this reinsurance applies on
> a contributing excess basis, when notice of claim is
> received by [ICSOP].

(Emphasis supplied.)

Notably, the Ninth Circuit confronted and interpreted an identical notice provision in Associated, 922 F.2d at 519. Perhaps for this reason, the parties have offered little to no analysis of the Facultative Certificate's notice provision. In Associated, the Ninth Circuit observed that "insurance companies have been held to a higher standard of compliance with notice provisions." Id. at 521. It also observed that the term "occurrence," frequently found in insurance policies, has been interpreted by the Supreme Court of California to mean "an accident which results, during the policy period, in bodily injury neither expected nor intended from the standpoint of the insured." Id. (quoting Preston v. Goldman, 42 Cal.3d 108, 119 (1986)). It further recalled its own definition of occurrence as "an event upon which the liability of the [reinsured] was predicated." Id. (citation omitted). Importantly, the Ninth Circuit went on to hold that a "cross-claim brought by [the

insured] against [its excess insurer] was an 'occurrence'" under the reinsurance contract, and "presented a 'reasonable possibility' of resulting in a claim under the reinsurance policy," thus triggering the obligation of the excess insurer to notify its reinsurer.  Id. at 521-22.  With respect to the clause requiring the excess insurer to notify the reinsurer "when notice of a claim is received," the Ninth Circuit "broadly defined the term 'claim' as an 'assertion, demand or challenge of something as a right; the assertion of a liability to the party making it to do some service or pay a sum of money.'"  Id. at 522 (citation omitted).  It therefore concluded that the excess insurer, which was incidentally ICSOP, had an obligation to provide notice to its reinsurer that was additionally triggered because the insured's cross-claim asserted against ICSOP constituted a "claim" within the meaning of the reinsurance agreement.  Id.

Applied to the present case, ICSOP's obligation to notify Argonaut arose, at the latest, in 2002 when Kaiser asserted a cross-claim against ICSOP in the California Coverage Action.[8]

---

[8] ICSOP was aware of a significant risk that its excess coverage -- and thus Argonaut's reinsurance coverage -- would be impaired long before 2002.  As the parties' briefs do not adequately address the meaning of "occurrence" within the Facultative Certificate, however, the Court declines to determine whether ICSOP's obligation to notify Argonaut may have arisen in 1989 or 2000, as Argonaut suggests.  Nonetheless, it is worth noting that, in Unigard II, the Second Circuit held that the relevant "occurrences" within the meaning of the reinsurance agreement's notice provision were the "exposures to asbestos" and that the ceding insurer's signing of a cost-sharing agreement was an event

Because ICSOP did not provide Argonaut with notice until June 2009, ICSOP breached its notice obligation under the Facultative Certificate.

A. Constructive Notice

ICSOP concedes that its provision of notice under the Facultative Certificate in 2009 was untimely.  It claims, however, that the question of whether ICSOP breached the Facultative Certificate's notice requirement cannot be determined at this time because a genuine dispute exists regarding whether Argonaut had constructive notice of the Facultative Certificate's potential involvement.

As ICSOP points out, California courts have recognized that constructive notice to a co-insurer satisfies the obligation to give notice under an insurance policy.  OneBeacon Am. Ins. Co. v. Fireman's Fund Ins. Co., 175 Cal.App.4th 183, 200 (Cal. Ct. App. 2009)(primary policy co-insurers).  Where there is "adequate notice of the potential for contribution and the opportunity for investigation and participation in the defense in the underlying litigation," constructive notice will suffice.  Id. at 201; see also Span, Inc. v. Assoc. Int'l Ins. Co., 227 Cal.App.3d 463, 483 (Cal. Ct. App. 1991)(the knowledge of the excess insurer of the underlying action and of the insolvency of the primary carrier placed it on inquiry notice).

---

increasing the likelihood to a reasonable possibility that the reinsurance would be involved.  Unigard II, 4 F.3d at 1065.

In New York, it is well established that an insured may not
rely on the doctrine of constructive notice.  The general rule is
that "[n]either notice provided by another insured nor the
insurer's actual knowledge of the claim satisfies the contractual
obligation of an insured to give timely notice." Roofing
Consultants v. Scottsdale Ins. Co., 709 N.Y.S.2d 782, 783 (4th
Dep't 2000); see also State v. Ackley, 664 N.Y.S.2d 876, 878 (3d
Dep't 1997); Heydt Contracting Corp. v. Am. Home Assurance, 536
N.Y.S.2d 770, 773 (1st Dep't 1989).  It is less clear that the
doctrine is unavailable in New York in the context of reinsurance
policies.  Because the doctrine is clearly available in
California, the Court applies California law on the issue of
constructive notice.

ICSOP has not presented evidence, however, from which a
reasonable trier of fact could conclude that Argonaut had notice
of any facts in 2002 that would have put Argonaut on inquiry
notice of the Facultative Certificate's impairment.  ICSOP's sole
support for its constructive notice contention is its speculation
that Argonaut may have received notice in 2002 pursuant to a
different reinsurance agreement between ICSOP and Argonaut -- the
Miscellaneous Special Business Treaty ("MSB Treaty") -- which
also reinsured the 1974 ICSOP Policy as one of the policies that
fell within a class of policies covered by the MSB Treaty.  It
contends that, if received, this notice would have alerted

25

Argonaut to the possibility that the Facultative Certificate
would also be impacted.

In support of this argument, ICSOP points to two notices
generated by ICSOP's computer system with respect the MSB Treaty
in 2000 and 2002.  According to ICSOP these notices were sent to
Guy Carpenter, AIG's reinsurance broker, in 2000 and 2002.  ICSOP
evidently concedes, however, that the 2000 notice never reached
Argonaut.[9]  In addition, inspection of Guy Carpenter and
Argonaut's files uncovered neither notice.

In the absence of evidence that Argonaut received the 2002
notice concerning the MSB Treaty, it is unnecessary to decide
whether receipt of such notice would have imposed a duty of
inquiry on Argonaut.  Thus, no reasonable trier of fact could
find that Argonaut was aware of facts that should have alerted it
to the potential involvement of the Facultative Certificate.

III. Prejudice

Both New York and California require a reinsurer to
demonstrate that it was prejudiced by the reinsured's late notice
in order to invoke a late notice defense.[10]  Under California

---

[9] A memorandum from Guy Carpenter dated June 16, 2003 explains
that notices and bills sent by ICSOP to Guy Carpenter under the
MSB Treaty between April 1999 and September 2001 were being
withheld from reinsurers by Guy Carpenter because they contained
an error in the treaty participation share.  Before the error was
corrected, Guy Carpenter's offices at Two World Trade Center were
destroyed in the 9/11 terrorist attack.

[10] ICSOP, citing to a handful of California cases, protests that
the burden of proving prejudice is more onerous in California.

law, "an insurer may assert defenses based upon a breach by the insured of a condition of the policy" -- such as a notice clause -- "but the breach cannot be a valid defense unless the insurer was substantially prejudiced thereby." Campbell v. Allstate Ins. Co., 60 Cal.2d 303, 305-06 (1963).[11]   The Ninth Circuit has predicted that the California Supreme Court "would apply the notice-prejudice rule to contracts of reinsurance." Associated, 922 F.2d at 525.   Similarly, in New York, the reinsured's breach of a reinsurance agreement's notice provision "will excuse performance only if it is material or demonstrably prejudicial." Unigard Sec. Ins. Co. v. North River Ins. Co., 79 N.Y.2d 576, 584 (1992) ("Unigard I").[12]

---

ICSOP's cases do not articulate a more demanding standard of prejudice, however, they merely reflect the fact that the "ultimate conclusion" on the existence of prejudice "in each case must depend on its own facts." Abrams v. Am. Fidelity & Cas. Co., 32 Cal.2d 233, 239 (1948).

[11] A California Court of Appeals addressed the late notice defense by a reinsurer in Central Nat. Ins. Co. of Omaha v. Prudential Reinsurance Co., 196 Cal.App.3d 342 (Cal. Ct. App. 1987).   In Central Nat. Ins., the Court of Appeals placed the burden of proving compliance with the reinsurance contract's notice provision on the reinsured and further provided that "[i]f the reinsured is unsuccessful in meeting its burden, a rebuttable presumption of prejudice arises." Id. at 787.   The Opinion in Central Nat. Ins., however, was depublished by the California Supreme Court, and was consequently rendered nonprecedential. See Cal. Rules of Ct. 8.1105, 8.1115.

[12] In the context of primary insurance, New York courts traditionally treated notice as a condition precedent to the primary insurance contract.   Accordingly, a primary insurer who demonstrated that the insured's notice was unreasonably late did not ordinarily need to also demonstrate prejudice as a result of the untimely notice.   In 2008, the New York legislature departed

In both New York and California, the burden of proving such prejudice is placed on the reinsurer.  See Shell Oil Co. v. Winterthur Swiss Ins. Co., 12 Cal.App.4th 715, 760 (Cal. Ct. App. 1993); Unigard I, 79 N.Y.2d at 584.  Moreover, in both States, the fact that a reinsurer has lost its right to associate in the control and defense of the underlying claim as a result of the reinsured's late notice is insufficient on its own to constitute prejudice.  Associated, 922 F.2d at 524; Unigard II, 4 F.3d 1068. Where the reinsurer has lost the right to associate itself with the underlying litigation due to late notice, the loss of that right will only establish prejudice if the reinsurer shows that "the results of the litigation would have been different" with its participation.  Unigard II, 4 F.3d at 1068-69.

Argonaut has submitted sufficient evidence to raise a genuine issue of disputed fact with respect to whether it was prejudiced in at least two ways by ICSOP's breach of the Facultative Certificate's notice provision.  But, the existence of prejudice cannot be determined as a matter of law based on the

---

from the no-prejudice rule and codified a prejudice requirement into New York's Insurance Law.  See N.Y. Insur. Law § 3420(a)(5). Section 3420's prejudice requirement, however, is only applicable to insurance policies issued or delivered in New York State after January 17, 2009.  See An Act to Amend the Civil Practice Law and Rules and the Insurance Law, in Relation to Liability Insurance Policies § 8, 2008 N.Y. Sess. Laws 388 (McKinney 2008).  New York courts continue to apply the no-prejudice rule to primary insurance policies issued before that date.  See, e.g., 310 East 74 LLC v. Fireman's Fund Ins. Co., 964 N.Y.S.2d 512, 513-14 (1st Dep't 2013); Tower Ins. Co. of New York v. Classon Heights, LLC, 920 N.Y.S.2d 58, 62 (1st Dep't 2011).

record presented with this motion.  Although Argonaut is unlikely
to show that its participation in the litigation would have
altered the ultimate legal rulings in the California Coverage
Action, Argonaut may establish that its participation in the
litigation would have resulted in not merely an earlier
settlement but a more advantageous one as well.  See Sequoia Ins.
Co. v. Royal Ins. Co. of Am., 971 F.2d 1385, 1393 (9th Cir. 1992)
(the excess insurer would have encouraged settlement).

Argonaut has submitted evidence suggesting that the 1974
ICSOP Policy exhibited a number of characteristics that would
have raised a "Red Flag" for Argonaut had it received earlier
notice.  In particular, Argonaut notes that its $1,000,000 per
occurrence indemnification obligation under the Facultative
Certificate was significantly higher than its average obligation
under its treaty reinsurance agreements, which constituted the
bulk of its business.  According to Argonaut, the fact that the
Facultative Certificate was written without an aggregate limit
would have also raised a red flag.  In addition, Argonaut had
previous informative experience with settling asbestos claims.
Argonaut had issued direct insurance policies containing no
aggregate limits to a precedcessor of a company called Western
MacArthur.  In the 1990's and early 2000's, Argonaut engaged in
coverage litigation with MacArthur in connection with those
policies and ultimately settled the claims in 2004.  See, e.g.,

29

<u>Argonaut Ins. Co. v. MacArthur Co.</u>, No. C 012-03878 (WHA), 2002
WL 145400, at *1 (N.D. Cal. Jan. 18, 2002).  Argonaut contends
that with earlier notice it could have brought its experience to
bear in the handling of the Kaiser asbestos claims.  There is,
moreover, no indication in the record that ICSOP sought to engage
in settlement negotiations with Kaiser at any time prior to 2009.
By the time it agreed to participate in mediation, the tide of
litigation had turned strongly against it, naturally diminishing
its bargaining position.

It is also noteworthy that the ordinarily appropriate
assumption in reinsurance cases that the interests of the
reinsurer and the reinsured will be aligned is not justified in
this case.  <u>See, e.g.</u>, <u>Unigard II</u>, 4 F.3d at 1054 (reinsurers are
"protected . . . by a large area of common interest with ceding
insurers."); <u>Associated</u>, 922 F.2d at 523 ("[B]ecause primary
insurers will usually provide an experienced defense, the
likelihood of prejudice from late notice is more remote.");
<u>Transport Ins. Co.</u>, 202 Cal.App.4th at 989 (describing parties to
reinsurance agreement as "essentially aligned -- not adverse.").
There is undisputed evidence that ICSOP's counsel chose not to
advocate the position most beneficial to the 1974 ICSOP Policy in
order to remain neutral on an issue with respect to which its
multiple clients had conflicting interests.  A reasonable trier
of fact could infer that ICSOP's counsel adopted a similar "best

interests of the group" mentality in its approach to considering the possibility of settlement.  Argonaut may demonstrate prejudice as a result of being denied an opportunity to encourage an earlier and more advantageous settlement.  Such prejudice may be shown even though Argonaut had no right to dictate ICSOP's settlement decisions.  The parties' agreement that Argonaut would have an opportunity to associate in the defense of any claim implicating the Facultative Certificate would be rendered hollow if it is presumed that a reinsurer will never have a meaningful influence on its reinsured's litigation and settlement decisions.  Under the circumstances, a reasonable trier of fact could conclude that Argonaut was substantially prejudiced by ICSOP's provision of late notice.

In addition, Argonaut has raised a genuine issue of fact with respect to whether, if it had received timely notice from ICSOP, it would have charged higher prices from its retrocessionaires for commutation agreements.[13]  Between 2001 and 2009, Argonaut entered into roughly a dozen commutation agreements through which it commuted approximately 23% of its reinsurance coverage.  Argonaut's Vice President testified that he believed that if Argonaut had been notified of the California

---

[13] The Court declines to adopt a per se rule that prejudice never exists where a reinsured's late notice caused a reinsurer to enter into disadvantageous commutation agreements with retrocessionaires.  While ICSOP argues that Associated prevents reliance on "collateral" prejudice, that decision did no more

Coverage Action, Argonaut would have charged a higher price for the commutations.  While ICSOP disputes this point, highlighting the fact that the IBNR -- a component of the formula used to set an appropriate price for commutation agreements -- accounts for the risk of unreported claims, that dispute merely creates an issue of fact to be decided at trial.  After all, an IBNR is necessarily an estimate, and it is not clear from the record that the commutation formula would be unaffected by Argonaut's receipt of notice that it's reinsured had actually become involved in the California Coverage Action.

IV. Bad Faith

Argonaut may be relieved of its burden to show prejudice, however, in the event that it can demonstrate that ICSOP acted in bad faith in not providing Argonaut with timely notice.  This exception to the requirement to show prejudice arises from the nature of the relationships among companies in the reinsurance industry.

In Unigard II, the Second Circuit offered an extended discussion of the purpose of reinsurance and the propriety of a bad-faith exception to the notice-prejudice rule.  The Court began by discussing the purpose of prompt notice in the reinsurance context:

> To enable them to set premiums and adequate reserves, and to determine whether to "associate" in the defense

---

than find a failure to show prejudice in the circumstances of that case.  Associated, 922 F.2d at 525.

> of a claim, reinsurers are dependent on their ceding
> insurers for prompt and full disclosure of information
> concerning pertinent risks.  The reinsurance
> relationship is often characterized as one of 'utmost
> good faith.' This utmost good faith may be viewed as a
> legal rule but also as a tradition honored by ceding
> insurers and reinsurers in their ongoing commercial
> relationships.  Historically, the reinsurance market
> has relied on a practice of the exercise of utmost good
> faith to decrease monitoring costs and ex ante
> contracting costs.  Reinsurance works only if the sums
> of reinsurance premiums are less than the original
> insurance premium.  Otherwise, the ceding insurers will
> not reinsure.  For the reinsurance premiums to be less,
> reinsurers cannot duplicate the costly but necessary
> efforts of the primary insurer in evaluating risks and
> handling claims.  Reinsurers may thus not have
> actuarial expertise, or actively participate in
> defending ordinary claims.  They are protected,
> however, by a large area of common interest with ceding
> insurers and by the tradition of utmost good faith,
> particularly in the sharing of information.

Unigard II, 4 F.3d at 1054.  While recognizing that the modern

relationship of reinsurers and their reinsureds may no longer be

characterized by utmost good faith, the Second Circuit

nevertheless concluded that "because information concerning the

underlying risk lies virtually in the exclusive possession of the

ceding insurer, a very high level of good faith -- whether or not

designated 'utmost' -- is required to ensure prompt and full

disclosure of material information without causing reinsurers to

engage in duplicative monitoring."  Id.  Thus, the Court

concluded that a ceding insurer's failure to provide prompt

notice will entitle a reinsurer to relief without showing

prejudice if (1) the ceding insurer deliberately deceives a

reinsurer, or (2) the ceding insurer fails to implement routine

practices and controls to ensure notification to reinsurers.  Id. at 1070.  Specifically,

> the proper minimum standard for bad faith should be gross negligence or recklessness.  If a ceding insurer deliberately deceives a reinsurer, that deception is of course bad faith.  However, if a ceding insurer has implemented routine practices and controls to ensure notification to reinsurers but inadvertence causes a lapse, the insurer has not acted in bad faith.  But if a ceding insurer does not implement such practices and controls, then it has willfully disregarded the risk to reinsurers and is guilty of gross negligence.  A reinsurer, dependent on its ceding insurer for information, should be able to expect at least this level of protection, and if a ceding insurer fails to provide it, the reinsurer's late loss notice defense should succeed.

Id. at 1069; see also Christiania Gen. Ins. Corp of New York v. Great Am. Ins. Co., 972 F.2d 268 (2d Cir. 1992).

While California courts have not yet addressed this exception to the requirement that a reinsurer show prejudice from late notice,[14] it is possible here to predict how the "state's highest court would rule on an issue."  Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 399 (2d Cir. 2001).

There are at least two reasons to predict that the

---

[14] It worth noting that the California Supreme Court has spoken on the issue of late notice in the reinsurance context in at least one instance, although the unusual facts of the case limit the lessons to be gleaned.  In Pacific Mut. Life Ins. Co. of Calif. v. Pacific Surety Co., 182 Cal. 555 (1920), the California court addressed a failure to give a reinsurer notice of an additional policy covered by its reinsurance.  The court construed the notice provisions in the reinsurance contract and held that the reinsurer was not relieved of its obligations under the reinsurance agreement.  It was observed, however, that "[o]f course, any claim of fraud or negligence would place a different aspect upon the case."  Id. at 560.

California Supreme Court would adopt a bad faith exception to the notice-prejudice rule.  First, the Second Circuit's decision in Unigard II relied, in part, on the fact that reinsurance agreements have historically been characterized by a duty of utmost good faith.  Pursuant to this duty, the reinsured is expected to covey all information material to the underlying risk to the reinsurer.  As Argonaut points out, this principle is reflected in California's Insurance Code, which instructs a reinsured to "communicate all the representations of the original insured, and also all the knowledge and information he possesses whether previously or subsequently acquired, which are material to the risk."  Cal. Ins. Code § 622; see also Unigard II, 4 F.3d at 1069.

Second, California courts recognize that reinsureds, who are themselves insurance companies, are sophisticated parties familiar with the practice of giving and receiving notice.  See, e.g., Transport Ins. Co. v. TIG Ins. Co., 202 Cal.App.4th 984, 989 (Cal. Ct. App. 2012); Associated, 922 F.2d at 521; see also Am. Bankers Ins. Co. of Florida v. Northwestern Nat. Ins. Co., 198 F.3d 1332, 1335 (11th Cir. 1999).  Accordingly, a requirement that the reinsured implement adequate practices and controls with respect to the provision of notice is minimally burdensome and consistent with the expectation of parties entering into a reinsurance agreement.

35

ICSOP argues that the California Supreme Court would be unlikely to adopt the Second Circuit's approach in Unigard II. ICSOP points to the fact that California and New York historically applied different standards to an insurer's late notice defense in the direct insurance context.  While California law requires insurers relying on a late notice defense in the direct insurance context to demonstrate prejudice, New York courts have traditionally followed the no-prejudice rule in the direct insurance context.

This difference in the direct insurance context is not compelling evidence regarding the existence of a bad faith exception in the reinsurance context.  In this regard, it is worth highlighting the decision of the New Hampshire Supreme Court in Certain Underwriters at Lloyd's London v. Home Ins. Co., 146 N.H. 740 (2001).  New Hampshire, like California, requires insurers in the direct insurance context to demonstrate prejudice in order to invoke the defense of late notice.  Dover Mills P'ship v. Comm. Union Ins. Co., 144 N.H. 336, 339 (1999). Despite the difference in approaches taken by New York and New Hampshire courts in the direct insurance context, the New Hampshire Supreme Court decided to "adopt the Second Circuit's rule that a reinsurer may be relieved from indemnifying its reinsured if it proves that the reinsured's late notice was due to gross negligence or recklessness, i.e., bad faith."  Certain

<u>Underwriters at Lloyd's London</u>, 146 N.H. at 743-44.  In doing so it observed that "[t]he trend in modern case law is to recognize that a very high level of good faith is required in the relationship between reinsurers and reinsureds."  <u>Id.</u> at 742. The court further explained that "[b]ecause the reinsurer relies on the reinsured for information in order to properly assess the risks, the good faith standard particularly applies to reinsureds timely notifying reinsurers of potential claims."  <u>Id.</u>

There are other reasons as well to discount any difference regarding the notice-prejudice rule in New York and California in the direct insurance as predictive of differences that may exist in the reinsurance context, and in particular in the recognition of a bad faith exception to the prejudice requirement in the reinsurance context.  First, the co-existence of a default notice-prejudice rule and a bad faith exception is not unusual. The notice-prejudice rule furthers a public policy that disfavors technical forfeitures, and a bad faith exception, consistent with this policy, acknowledges that when the reinsured has been grossly negligent in providing notice to the reinsurer, its forfeiture of coverage is not the result of a mere technicality.

Second, because the purpose of reinsurance differs in important respects from the purpose of direct insurance, the reasoning of decisions issued in the direct insurance context is not uniformly persuasive on questions arising in the reinsurance

37

context.  For each of these reasons, it is appropriate to predict that a New York court would decide that California courts would adopt a bad faith exception to the duty of a reinsurer to demonstrate prejudice.

ICSOP next urges the Court to follow the course of the Seventh Circuit in Zenith Ins. Co. v. Employers Ins. Of Wausau, 141 F.3d 300, (7th Cir. 1998), which found no analog to New York's bad faith exception under Wisconsin law, and concluded that the district court erred in predicting that the Wisconsin Supreme Court would be likely to adopt the exception.  Id. at 308.  ICSOP's reliance on the Zenith decision is not persuasive.

The Zenith court relied on its conclusion that Wisconsin courts had only acknowledged "a general duty of good faith and fair dealing between the parties to a contract," and had not adopted the "'utmost'" good faith standard for reinsurance contracts.  Zenith, 141 F.3d at 308.  As already noted, California has expressly codified a reinsured's obligation to provide its reinsurer with all information relevant to the risk underwritten -- a codification which reflects the principal of utmost good faith historically recognized in reinsurance contracts, and which was borrowed from New York's Field Code. See Staring, Grayon, The Law of Reinsurance Contracts in California in Relation to Anglo-American Common Law (1988). California courts also recognize that parties to reinsurance

contracts are sophisticated parties.  It is therefore easy to infer that those courts would impose on those sophisticated parties a higher duty of good faith than that which inures to every contractual relationship.

In sum, although California courts have not decided whether to recognize a bad faith exception to the notice-prejudice rule in the reinsurance context, this Court predicts that it would recognize such an exception.  The initial phase of litigation in this action, however, was restricted solely to the issue of whether Argonaut was prejudiced by ICSOP's late notice, and no discovery into ICSOP's bad faith has been conducted.  Argonaut has accordingly submitted a declaration pursuant to Federal Rule of Civil Procedure 56(d) in which it requests an opportunity to conduct discovery on the issue of ICSOP's bad faith.  Following the issuance of this Opinion, the parties will be permitted to take discovery on this issue before proceeding to trial.

CONCLUSION

The plaintiff's June 12, 2013 motion for summary judgment is granted in part.  The defendant's June 12, 2013 motion for summary judgment is denied

Dated:    New York, New York
          August 6, 2013

_____
                      DENISE COTE
              United States District Judge

39